[No. F009578. Fifth Dist. Mar. 13, 1989.]

GEORGE DAVID BANE, Plaintiff and Appellant, v.
THE STATE OF CALIFORNIA et al, Defendants and Respondents.

WILLIAM ENGLAND et al., Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

[Opinion certified for partial publication.*]

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part 1 (b) of the Discussion.

862

COUNSEL

Barr, Newlan & Sinclair and John D. Barr for Plaintiffs and Appellants.

Joseph A. Montoya, Ronald I. Harrison, George L. Cory and Richard A. Wehe for Defendants and Respondents.

## OPINION

## FRANSON, P. J.—

### STATEMENT OF THE CASE

This appeal follows the trial of consolidated actions for personal injuries and wrongful death arising out of a two-car collision on May 30, 1985. Plaintiff, George Bane, and plaintiff's decedent, Timothy England, were traveling westbound on State Route 152 when their Toyota van was struck by a vehicle driven by David Castro, who was making a left turn from eastbound Route 152 to northbound Route 33.

Plaintiffs sued the State of California on the theory the intersection constituted a dangerous condition of public property. The state raised the defense of design immunity pursuant to Government Code section 830.6.[1] Trial commenced July 21, 1987. After nine days of testimony, the court ruled that design immunity had been proved and entered judgment in favor of the state.

■ The issue before this court is whether the evidence produced at trial was sufficient to support the design-immunity defense, specifically whether: (1) the 1984 design changes in the intersection were properly approved; (2) all of the design changes were on the plans as approved; and (3) if the state had design immunity for the 1984 changes, the immunity ended once the state had notice the design was dangerous and a reasonable period of time to acquire the funds and to correct the dangerous condition.

We conclude that although the state established the necessary elements of a design immunity for the 1984 changes at the intersection, the immunity ended before the subject accident occurred because of the state's failure to initiate remedial measures within a reasonable period of time after notice that the intersection was still dangerous despite the approved design.

### STATEMENT OF FACTS

Route 152 is a four-lane divided highway which runs in an east-west direction. Route 33, a two-lane road, runs in a north-south direction with its southern terminus at Route 152. A county road runs to the south of the intersection. There is an Interstate 5 (I-5) interchange at Route 152, about two miles east of the intersection, and another interchange at Route 33, about three miles north of the I-5/Route 152 interchange at the community

---

[1] All statutory references are to the Government Code unless otherwise indicated.

of Santa Nella. In geometric terms, I-5 forms the hypotenuse of a triangle, and Routes 152 and 33 form the other two sides. Sometime prior to 1984, a directional sign was installed advising eastbound Route 152 traffic to turn left at Route 33 for northbound I-5.

Route 152 was originally constructed in 1922 as a two-lane road. In 1954, the present westbound lanes of the roadway were added which converted the road to a four-lane divided highway. Additional improvements were made through June 1984, and each was constructed pursuant to a plan approved in advance by an authorized state employee.

Mr. Boyd, the district traffic engineer, was the California Department of Transportation (Caltrans) employee responsible for the safety of the intersection when the 1984 and 1985 roadway changes were made. He was a registered civil and traffic engineer and had worked for Caltrans since 1960 at several positions of increasing responsibility. Boyd described the Caltrans system for determining how money is spent on roadway improvement projects. Since the needs far exceed the money available, Caltrans prioritizes projects by way of a safety index calculation which is based on a cost-benefit ratio. A problem area must score a minimum number of points to be entitled to improvement program monies. Through 1982, the Route 152/33 intersection did not qualify for safety improvement monies.

In 1982, at the request of the California Highway Patrol, Caltrans analyzed the accidents occurring at the intersection. The study identified an increasing number of collisions involving eastbound vehicles turning left to go north on Route 33 colliding with westbound vehicles on Route 152. The intersection was averaging twice as many accidents as similar intersections statewide.

As a result, Caltrans decided to revise the left-turn channelizations and require left-turning motorists to stop before initiating a turn. To this end, the Caltrans engineer lengthened and relocated the left-turn lanes toward the center of the roadway and separated the turn lanes from the through-traffic lanes by painted islands and 30-inch high traffic delineators. A limit line and stop sign were placed at the end of each left-turn lane. The district director of transportation and chief office engineer approved and signed plans for the project before construction commenced. As part of the project, a plan designating striping, the delineators and signing was prepared but was not signed. However, Boyd approved the plan prior to its implementation.

The project was completed June 28, 1984. For the next 12 months, Boyd and his staff monitored the intersection closely to determine whether the

design had the desired effect of reducing left-turn accidents. In the year before the modifications were implemented, there were 30 accidents (18 involving left-hand turns) with 3 fatalities at the intersection. In the year after, there were 32 accidents (10 involving left-hand turns) and 3 fatalities. Since traffic volume had increased over the second year, the accident statistics reflected a 14 percent reduction in total accidents and a 44 percent reduction in left-turn accidents as a result of the improvements.

In November 1984, an investigation of accidents at the intersection disclosed a significant reduction in left-turn accidents but an increase in cross-traffic collisions. Boyd felt more time was needed to evaluate the changes made and to enable the project to work. He acknowledged that removal of the directional sign advising a left turn to connect with I-5 might discourage use of the intersection, and an interchange would be the ultimate solution. However, for various reasons he felt removal of the I-5 sign was not a viable alternative.

By February 1985, the intersection was averaging two accidents a month. However, in March, April and May of 1985, the average number of accidents per month at the intersection increased to five. At that point, Boyd felt the intersection needed modification. In mid-May he recommended a costly interchange be built and a four-way stop be installed in the interim. The four-way stop project was approved as an emergency project and was completed on August 18, 1985. In addition, the sign advising a left turn for northbound I-5 was removed on July 31, 1985. After those changes, the accident rate decreased dramatically.

Unfortunately, on May 30, 1985, before the 1985 changes were made, David Castro made a left turn at the intersection directly in front of George Bane's vehicle. Mr. Castro was traveling from Salinas to Sacramento and intended to take Route 33 to I-5. He had driven through the intersection and made the same left turn on two prior occasions. As he approached the intersection, he did not notice the sign advising him to turn left to connect with I-5. He came to a complete stop at the limit line and remained stopped for three to four minutes. He saw no vehicles so began his turn and struck the van broadside. He testified Mr. Bane's van seemed to come out of the ground.

Mr. Bane was driving a Toyota van carrying four passengers. When Castro's vehicle struck the van, the van rolled over ejecting the three occupants who were not wearing seatbelts. Timothy England died as a result, and Mr. Bane suffered physical injuries. The other three passengers settled their claims and are not parties to this appeal.

Appellants' expert, Darrell Wilburn, a traffic engineer and transportation planner from Idaho, investigated the intersection on June 5, 1985. He was of the opinion that the intersection was dangerous because the configuration of the road, combined with the left-lane delineators, restricted visibility. He also felt the 1984 design was not reasonable. The best low-cost solution, in his opinion, was to restrict all left turns at the intersection or to place four-way stops at the intersection.

## DISCUSSION

1. *Did the state prove the elements of a design-immunity defense?*

(a) *The 1984 changes in the intersection were properly approved.*

■ From 1922 to 1984, all highway construction in the area of the Route 152 and Route 33 intersection was done according to plans signed by authorized state employees. However, no state employee signed the June 1984 plans which provided for the roadway striping, the traffic delineators and the sign placements. Appellants contend that because these plans were not signed, they were not properly approved under section 830.6,[2] and the state was not entitled to design immunity.

■ Design immunity is an affirmative defense to liability for a dangerous condition of public property. If the state is entitled to design immunity, regardless of the evidence appellants present as to a defect in the design of the intersection, they may be denied recovery from the state.

■ The rationale behind design immunity is to prevent a jury from reweighing the same factors considered by the governmental entity which approved the design. "[T]o permit reexamination in tort litigation of particular discretionary decisions where reasonable men may differ as to how the discretion should be exercised would create too great a danger of impolitic interference with the freedom of decision-making by those public officials in whom the function of making such decisions has been vested." (4 Cal. Law Revision Com. Rep. (1963) p. 823, quoted in *Cameron* v. *State of California*

---

[2] Government Code section 830.6 provides in part: "Neither a public entity nor a public employee is liable under this chapter for an injury caused by a plan or design of a construction of, or an improvement to, public property where such plan or design has been approved in advance of the construction or improvement by the legislative body of the public entity or by some other body or employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved, if the trial or appellate court determines that there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or design or the standards therefor or (b) a reasonable legislative body or other body or employee could have approved the plan or design or the standards therefor. . . ."

(1972) 7 Cal.3d 318, 326 [102 Cal.Rptr. 305, 497 P.2d 777].) ■ Three elements must be established to claim the defense: (1) a causal relationship between the plan and the accident, (2) discretionary approval of the plan prior to construction, and (3) substantial evidence supporting the reasonableness of the design. (*Ramirez* v. *City of Redondo Beach* (1987) 192 Cal.App.3d 515, 523 [237 Cal.Rptr. 505].) ■ Whether design immunity and each of its elements exist is an issue of law, i.e., the reviewing court must determine whether the state has met its burden of establishing as a matter of law all the elements of the defense of design immunity. (*Cameron* v. *State of California, supra,* 7 Cal.3d 318, 325.)

■ Appellants do not dispute the first and third elements; rather, they claim the state did not establish the prior approval element. They argue, under Business and Professions Code section 6735,[3] all plans for highway construction or modification must be signed by the approving engineer before design immunity can attach. If the plans are not signed, they are not "approved" under section 830.6, and the state is not entitled to the statutory immunity.

Appellants rely on several cases which we find distinguishable. In *Johnston* v. *County of Yolo* (1969) 274 Cal.App.2d 46 [79 Cal.Rptr. 33], plaintiff was injured when the car in which he was riding failed to negotiate a double curve on a county road. The appellate court confirmed there was no design immunity. The evidence showed the county road commissioner never approved the design of the double-curve project. In fact, he disapproved it but ordered it built anyway. He testified, in effect, the design was contrary to his professional judgment as an engineer, but he felt constrained to order its construction out of deference to the county board of supervisors. (*Id.* at p. 54.)

In the second case, plaintiffs' decedent was killed after a head-on collision with another vehicle which had illegally crossed into her lane of travel. She tried to avoid the collision by swerving to the right but went over a steep embankment into a channel from which the embankment had been excavated. Her car overturned, and she drowned in the channel. (*Levin* v. *State of California* (1983) 146 Cal.App.3d 410 [194 Cal.Rptr. 223].) The court noted that the rationale of the design-immunity defense is to prevent a jury from reweighing the factors considered by the governmental entity which decided

---

[3] Business and Professions Code section 6735 provides in part: "All civil engineering plans, specifications, and reports shall be prepared by a registered civil engineer or by a subordinate under his or her direction, and shall be signed by him or her to indicate his or her responsibility for them. In addition to the signature, all final civil engineering plans, specifications, and reports shall bear the seal or stamp of the registrant, and the expiration date of the certificate or authority. . . ."

to approve the design. However, the defense does not immunize decisions which have not been made. Here, there was no evidence that the public official had considered all aspects of the roadway design and weighed the alternatives before approving the plan. Accordingly, the state failed to establish that the roadway design had been approved by an authorized public official. (*Id.* at p. 418.)

To the contrary, in this case, Boyd testified he personally approved as reasonable the striping, delineators and sign plans in advance of construction. Those types of plans, which involved work to be done by Caltrans and not the contractors, were customarily not signed because they are not included in the package submitted to the contractor as part of the bidding process.

Appellants argue the present case should be compared with *Thomson* v. *City of Glendale* (1976) 61 Cal.App.3d 378 [132 Cal.Rptr. 52], where a design immunity was found to apply because there was no law requiring the handrail plans on a public stairway had to be approved by an engineer. Plaintiff contended the handrail plans did not comply with the section 830.6 requirements because they were only shop drawings designed by an outside fabricator rather than a public employee. The superintendent of maintenance had prepared a sketch to give the designer a general idea of what he wanted. An outside engineering company then drew shop drawings for the superintendent who approved the design and returned the drawings to the engineering company. The court found the design adequate. "There is no requirement that the design be expressed in any particular form. The plan need only be sufficiently explicit to assure that it is understandable to the employee giving the approval." (*Id.* at p. 385.)

Appellants submit the *Thomson* court reached the conclusion it did because, unlike the present case, there was no statutory requirement that the handrail plans be approved by an engineer. Highway plans, construction or modification plans must be signed by an engineer. (Bus. & Prof. Code, §§ 6731, 6735.) Appellants' contention is based, however, on the assumption that the Caltrans plans must comply with the Business and Professions Code requirements in order to meet the section 830.6 requirement of a "plan or design . . . approved in advance of the construction or improvement by the . . . employee exercising discretionary authority to give such approval . . . ."

We do not read *Thomson* v. *City of Glendale, supra,* 61 Cal.App.3d 378, as requiring compliance with Business and Professions Code section 6735 before a design immunity can exist under section 830.6. Business and Professions Code section 6735 requires that all civil engineering plans be

prepared by a registered civil engineer, or by a subordinate under his direction, and shall be signed by him. The purpose behind the signature requirement is to establish accountability. When design drawings are not signed, as was the case with the striping, delineator and sign plans, the public entity has a more difficult time demonstrating that the plans were "approved." Nevertheless, if the public entity can prove the requisite approval with oral testimony, as it did here, the approval element of design immunity is met.

Moreover, Business and Professions Code section 6735 does not provide that a plan is invalid if it is unsigned, and section 830.6 does not require that the approved plan contain the signature of the preparer or the party approving the plan. It is not the form of the plan or the form of the approval that is critical to design immunity. (*Thomson* v *City of Glendale, supra,* 61 Cal.App.3d 378, 385.)

(b) *All of the elements of the design were incorporated in the approved plans.* \*

. . . . . . . . . . . . . . . . . . . . . .

(c) *The state lost its design immunity because of notice the design was dangerous and because it failed to take remedial measures within a reasonable time period.*

In *Baldwin* v. *State of California* (1972) 6 Cal.3d 424 [99 Cal.Rptr. 145, 491 P.2d 1121], the Supreme Court held the design immunity of section 830.6 is not perpetual. It may be lost if, after the original improvement has been completed according to a reasonably approved plan, the improvement functions under changed circumstances as a dangerous condition of which the public entity has actual or constructive notice. Design immunity is intended to exist only so long as the surrounding physical conditions, presumably considered at the time of the initial design approval, have not changed. If physical conditions have changed, the jury would be assessing evidence arising out of actual operation of the plan that could not have been contemplated by the public entity when it approved the design. In such a situation, there is no threat of undue interference by the courts with discretionary decisionmaking by government officials. (*Id.* at pp. 434, 435.)

The *Baldwin* court relied on a report of the Law Revision Commission, the group which had drafted section 830.6 and had proposed legislation terminating design immunity where (1) the plan or design, as effectuated,

---

\* See footnote, *ante,* page 860.

resulted in a "dangerous condition" at the time of an injury, (2) prior injuries occurred that demonstrated that fact, and (3) the public entity had knowledge of the prior injuries and a reasonable time to protect against the dangerous condition. (9 Cal. Law Revision Com. Rep. (1969) p. 816, as cited in *Baldwin* v. *State of California, supra,* 6 Cal.3d at p. 435.) The state points out, however, that *Baldwin* has been limited to situations involving changed physical conditions. (See, e.g., *Ramirez* v. *City of Redondo Beach, supra,* 192 Cal.App.3d 515, 527.)

In 1979, the Legislature amended section 830.6 and added: "Notwithstanding notice that constructed or improved public property may no longer be in conformity with a plan or design or a standard which *reasonably* could be approved by the legislative body or other body or employee, the immunity provided by this section shall continue for a reasonable period of time sufficient to permit the public entity to obtain funds for and carry out remedial work necessary to allow such public property to be in conformity with a plan or design approved by . . . the public entity . . . or with a plan or design in conformity with a standard previously approved by such legislative body . . . or employee. . . ." (Italics added.)

No cases have interpreted the effect of the 1979 additions to section 830.6.

Although the 1979 amendment to section 830.6 could have been drafted with more clarity, a reasonable, commonsense interpretation of the quoted language is that once the public entity has actual or constructive notice that its property may no longer be in conformity with a reasonable design or plan, the immunity nonetheless will continue for a reasonable period of time to allow the entity to obtain funds and to carry out remedial work to bring the property into conformity with the *reasonable* design or plan. ■■■ In other words, as applied to the present case, once the state was put on notice that the June 1984 design for which the state had immunity nevertheless produced a dangerous condition, the immunity continued only for a reasonable time to allow the state to acquire the funds and to correct the dangerous condition. Once this time period expired, the immunity ended. This interpretation accords with the basic principles of *Baldwin* v. *State of California, supra,* 6 Cal.3d 424 and the 1969 Law Revision Commission Report and Recommendations. It also is consistent with the general rule that a public entity is liable for an injury caused by a "dangerous condition"[4] of its property if the entity created the dangerous condition and had actual or

---

[4] A "dangerous condition" is defined by section 830, subdivision (a) as one "that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used."

constructive notice of it and failed to take reasonable measures to protect against the risk of injury it created. (See §§ 835-835.4.)

 The state does not question the above interpretation of the amendment but argues that regardless of the amended statute *Baldwin* requires a plaintiff to show a change in the physical conditions of the intersection, its approaches or the surrounding land before the design immunity may be terminated.

Appellant counters that under the plain language of the statute no change in the physical conditions of the intersection need be shown; if the approved design is subsequently shown to be dangerous for *any reason* and this fact is known to the public entity, then the reasonable time period commences for the entity to obtain funds and to carry out the remedial work.

We hold that the amendment nullified the *Baldwin* language requiring a change in physical conditions before an approved design may be deemed unreasonable. On this point, we disagree with *Ramirez* v. *City of Redondo Beach, supra,* 192 Cal.App.3d at page 527, where the court stated in passing that the "changed condition" exception to immunity is applicable only when " 'experience has revealed the dangerous nature of the public improvement under changed physical conditions,' " quoting from *Baldwin, supra,* 6 Cal.3d 424 at page 435. Although *Baldwin* did involve what that court characterized as a change in the physical conditions at the accident scene (a large increase in traffic over a 20-year period), it was speaking to the facts of the case before it. We do not read *Baldwin* as limiting the termination of immunity to only those cases which involve a change of the physical conditions of the property. Furthermore, in drafting the 1979 amendment to section 830.6, the Legislature is presumed to have been aware of the *Baldwin* holding, yet it did not limit the loss of immunity to changed physical conditions which result in a dangerous condition. Rather, the amendment language is unlimited; thus, the amendment should be construed to mean that immunity is lost if the subsequent history shows the design was unreasonable for any reason once the public entity has notice of the dangerous condition and has a sufficient time period to remedy it. No public policy is served by continuing to immunize the public entity for a plan after it becomes clear that its design is no longer reasonable and an opportunity to make a change is afforded. We now apply the statute to the facts of this case.

 The trial court found the state had modified the intersection design by placing four-way stops at the intersection in August of 1985, a reasonable time period in response to traffic accident data collected after the 1984 changes. The 1984 project was opened to traffic on June 28, 1984. Between

July 1984 and February 1985, the intersection averaged a total of two accidents per month. It was Boyd's opinion that, while not excessive, the number of accidents was not as low as he would like, but he felt the 1984 design was working as well as other traffic engineering remedies available to him, such as four-way stops or signals. However, in March, April and May of 1985, the total number of accidents increased to five accidents per month. Upon receipt of the information in mid-May 1985, Boyd recommended that an interchange be installed, and in June 1985, he decided to place four-way stops at the intersection as an interim solution. However, it was not until July 31, over two months after Boyd had decided the intersection was unsafe, that the left-turn I-5 directional sign was removed.

The post-June 1984 accident information received by the state must be evaluated in the light of the prior information received by the state on the accidents at the intersection. Starting in 1982, at the request of the California Highway Patrol, Caltrans analyzed the number of accidents occurring at the intersection. The studies revealed the intersection was averaging twice as many accidents as similar intersections in the state with an increasing number involving left-turning vehicles colliding with westbound vehicles. On April 9, 1984, during the planning stage for the 1984 improvements, Captain Hoffman, commander of the Los Banos area Highway Patrol, wrote a letter to Preston Kelley, director of Caltrans, concerning "SUGGESTED ENGINEERING CHANGES" at the intersection. He first described the "PROBLEM": "The intersection of SR 152 and SR 33 (Santa Nella Boulevard) is frequently the scene of major injury accidents. During the past three years (1981-1983) this intersection averaged 16 accidents on an annual basis. Seventy-five percent of these accidents involved right-of-way violations as vehicles turned from eastbound SR152 to SR33. While we have no statements to substantiate our belief, *we suspect the sign which designates 'Northbound I-5' at Santa Nella Boulevard is a temporary distraction; particularly for the out-of-area motorist. We believe a large majority of the out-of-area motorists are seeking Interstate-5. They unexpectedly observe the northbound sign prior to the intersection of SR33 (Santa Nella Boulevard) and negotiate the turn while not focusing the necessary attention on westbound traffic.* " (Italics added.)

Captain Hoffman then made the following suggestion: "The plans to lengthen the westbound decelleration [*sic*] lane and the placement of a stop sign at this location will eliminate part of the problem. *In the interim, we recommend the removal of the northbound I-5 designation signs prior to this intersection.*" (Italics added.)

On May 16, 1985, Mr. Boyd wrote a letter to Mr. Miller, the chief of program planning of Caltrans, which is quite revealing in that Boyd finally

acknowledged the 1984 design had not worked. A reasonable inference can be drawn from the contents of this letter that Boyd not only had decided at the time he wrote the letter that the 1984 design had proved to be dangerous but that he had held that belief for some time. In the letter, Boyd stated that his department's "solution" had not accomplished its goal and that future efforts in this vein would continue to be futile because they had been taking a *"bandaid" approach"* to the accident problem which had not produced acceptable results. Boyd then recommended that instead of attempting more *"Mickey Mouse"* projects, they should immediately initiate a project to provide an interchange at the location. Boyd also stated that in the interim his department was considering the installation of a four-way stop; although this location would not normally qualify for a four-way stop, in light of its accident history, "we must take a positive action, which will provide some relief until an interchange can be constructed." Promptly after Boyd's letter, the four-way stop design was approved as an emergency measure; however, the sign directing a left-turn for northbound I-5 was *not* removed until July 31, 1985, more than two months later.

Also received in evidence is a letter dated May 20, 1985, from P.D. Henley, commander of the Highway Patrol, Los Banos area, to the central division of the Highway Patrol concerning the "serious accident problem" at the Routes 152-33 intersection. "It is apparent that the work done by Cal Trans at this intersection, completed in late July, 1984, has not had the accident reducing effect hoped for." After noting the reflectorized paddle markers installed on eastbound 152 "are very confusing, especially during darkness," the letter discussed: "An additional problem exists that promotes unsafe lane changes at the intersection . . . . A large sign indicates that a left turn is necessary for eastbound 152 motorists to connect with northbound I-5. This turn funnels all traffic onto SR33 through the already congested Santa Nella area. It is only three miles straight ahead to northbound I-5 which intersects the Santa Nella businesses. Those motorists not needing or desiring to stop would alleviate the congestion problem."

Commander Henley's letter also refers to an attached editorial of the Los Banos Enterprise, the local newspaper, which states in part: "Construction of a four-way stop complete with warning signs and lights at the *deadly intersection* of Highways 152 and 33 will begin early next week, according to a spokesman for the state Department of Transportation. [¶] Five people have been killed and 89 injured in 47 separate accidents at the intersection since January 1984. [¶] This month alone there have been six accidents resulting in six injuries.

"Lt. Pat Henley, Area Commander of Los Banos CHP office, [is quoted as stating] [¶] 'In my opinion, whoever is in control of this intersection should be put in jail. [¶] It should be priority to fix intersections like this,' he said.

"When a Cal Trans spokesman was asked why the Department of Transportation did not react to the problem sooner in view of the number of accidents, he replied, 'We were hopeful that low cost expedients at the intersection would work (i.e. left turn lanes and lane markers completed last year), but it appears that they have not.'" (Italics added.)

On May 15, 1985, 15 days before the accident, Caltrans engineers recommended an interchange for the intersection. As an interim solution until the interchange could be completed, Caltrans decided to construct and install a four-way stop at the intersection. As noted above, on May 20, 1985, the Highway Patrol wrote a memo to Caltrans again urging the removal of the directional sign advising a left turn by eastbound traffic for I-5 northbound traffic. This recommendation for removal of the directional sign had also been made two months before the June 1984 project was completed and again after the November 1984 study of how the intersection was performing. The removal of the sign was still being considered as an alternative remedial action as of March 1985.

Caltrans's after-the-fact rationale that because the intersection had 30 accidents with 18 involving left-hand turns in the year before the 1984 design modifications were made but that it had only 32 accidents with 10 involving left turns in the year following the modifications cannot reasonably justify the delay from November 1984 to May 1985 to initiate emergency measures to reduce the number of left-turn accidents at the intersection. Statistical arguments do not overcome reality. The facts are that while the November 1984 study disclosed a reduction of left-turn accidents during the five-month period after the improvements, the study also showed an increase in cross-traffic accidents. Nor can we accept the proposition that 32 accidents at the intersection per year with 10 involving left turns shows in any fashion that the intersection as designed was reasonably safe. By February 1985, the intersection was still "averaging" two accidents per month, and in March the average increased to five per month. No traffic engineer reasonably could call this a safe condition.

Nor can we accept Mr. Boyd's explanation as to why he failed to post no left-turn signs at the intersection or remove the eastbound I-5 left-turn directional sign before the subject accident of May 1985. Boyd acknowledged that both of these procedures would have been low cost alternatives, but he did not believe either alternative would solve the left-turn problem.

In his view, people traveling through the area either were familiar with the area and knew that Route 33 was a shortcut to northbound I-5 or were strangers to the area who would use a map and recognize that Route 33 was the more direct route to northbound I-5.

In either event, according to Boyd, the drivers would ignore the no left-turn signs. This is pure speculation on Boyd's part and does not justify the state's failure to take such remedial measures promptly upon notice of the continued large number of traffic accidents caused by eastbound left-turning motorists. Nor can we accept Boyd's explanation about "political" and "economic" concerns associated with taking down or replacing the I-5 left-turn directional sign with a no left-turn sign. Opposition by the Santa Nella Chamber of Commerce, for example, cannot justify disregarding the motoring public's safety.

As we have explained above, under section 830.6, the immunity is lost if the subsequent accident history shows the design for any reason no longer conforms to a design which the entity reasonably could approve, once it has notice of the nonconformity and a sufficient period of time to take remedial action. (9 Cal. Law Revision Com. Rep., *op. cit. supra,* p. 819; cf. *Baldwin* v. *State of California, supra,* 6 Cal.3d at p. 435.) The failure of the state to remove the eastbound left-turn directional sign to northbound I-5 and to replace it with no left-turn signs at the latest within two to three days after May 16, 1985, when the state had notice of the dangerous design, terminated the immunity under section 830.6.

The judgment is reversed. Costs are awarded to appellants.

Hamlin, J., and Stone (W. A.), J., concurred.

A petition for a rehearing was denied April 6, 1989, and respondents' petition for review by the Supreme Court was denied May 23, 1989.