[No. H006370. Sixth Dist. Oct. 2, 1991.]

DENNIS UYENO et al., Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA, Defendant and Respondent.

COUNSEL

John W. Coakley for Plaintiffs and Appellants.

Joseph A. Montoya, Robert J. DeFea, Kenneth G. Nellis, Robert E. Brown and Adele S. Grunberg for Defendant and Respondent.

OPINION

AGLIANO, P. J.—Dennis Uyeno and Nita Uyeno (appellants) appeal from a judgment dismissing their action against the State of California (respondent), for the wrongful death of their son, James. James was struck and killed by a small truck as he crossed a street at a controlled intersection. Appellants claimed that improper timing of the traffic signals at the intersection caused the accident. Upon the close of evidence in a jury trial, the court granted the state's motion for judgment based upon the design immunity defense set forth in Government Code section 830.6.[1] We affirm the judgment for the reasons stated below.

FACTS

James Uyeno, age 10, was killed on July 5, 1985, while riding his bicycle home from summer school. He was attempting to cross Alum Rock Avenue

---

[1]All further statutory references are to the Government Code, unless otherwise indicated.

(State Route 130) at its intersection with Fleming and Kirk Avenues in the City of San Jose (see diagram in appendix). James stopped on the sidewalk to wait for the walk signal. When the walk signal appeared, he proceeded, half walking and half riding his bicycle, into the marked pedestrian crosswalk. A truck being driven by Lisa Bishop westerly on Alum Rock came across the full length of the intersection and struck him.

Appellants filed this action against the state for wrongful death, alleging the traffic signals at the intersection were improperly timed so as to create a dangerous condition.[2] More specifically, appellants alleged that the light sequences were set in such manner that a pedestrian crossing Alum Rock Avenue southerly toward Fleming Avenue (as was James) could receive the walk signal before traffic legally proceeding westbound on Alum Rock (as was Bishop) would have cleared the intersection.[3] A pedestrian would therefore be given a false sense of security about the safety of proceeding into the crosswalk. Appellants theorized the timing system should have included a two-second all red mode (as opposed to the one-half second all red mode it utilized) which would have allowed all vehicles to clear the intersection before pedestrians were directed to proceed.

Respondent made several pretrial motions for judgment, including a motion for summary judgment, arguing that the design immunity defense set forth in section 830.6 precluded its liability.[4] The court denied these motions, noting it would rule on the applicability of section 830.6 after it had heard all of plaintiff's evidence at trial. A jury trial began on June 13, 1989. After both parties rested, but before the jury began deliberation, respondent renewed its motion for judgment based on section 830.6. The court granted it at this time, and entered judgment for respondent. On appeal, appellants contend that section 830.6 was erroneously applied in this case because the timing of the traffic signals did not constitute a "plan" or "design" within the meaning of section 830.6, and even if it did, there is no substantial evidence to support a finding that the timing plan was reasonable.

---

[2]Appellants also sued Bishop. A default judgment was entered against her in the amount of $622,585 for James's mother and $602,875 for his father.

[3]Whether the light for Bishop when she entered the intersection was green, yellow or red was in dispute. For purposes of the issue presented in this appeal, we will assume she entered legally.

[4]Section 830.6 provides, in relevant part: "Neither a public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of a construction of, or an improvement to, public property where such plan or design has been approved in advance of the construction or improvement by the legislative body of the public entity or by some other body or employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved, if the trial or appellate court determines that there is any substantial evidence upon the basis of which (a) a reasonable public employee could have adopted the plan or design or the standards therefor or (b) a reasonable legislative body or other body or employee could have approved the plan or design or the standards therefor."

DISCUSSION

■ Design immunity is an affirmative defense to liability for a dangerous condition of public property. The legislative purpose in enacting section 830.6 of the Tort Claims Act is "well expressed in the comments of the California Law Revision Commission, wherein the rationale therefor was stated as follows: 'There should be immunity from liability for the plan or design of public construction and improvements where the plan or design has been approved by a governmental agency exercising discretionary authority, unless there is no reasonable basis for such approval. While it is proper to hold public entities liable for injuries caused by arbitrary abuses of discretionary authority in planning improvements, to permit reexamination in tort litigation of particular discretionary decisions where reasonable [persons] may differ as to how the discretion should be exercised would create too great a danger of impolitic interference with the freedom of decision-making by those public officials in whom the function of making such decisions has been vested.' (4 Cal. Law Revision Com. Rep. (1963) p. 823.)" (*Mikkelsen* v. *State of California* (1976) 59 Cal.App.3d 621, 630 [130 Cal.Rptr. 780].)

■ In order for a public entity to establish design immunity as a defense, it must show (1) A causal relationship between the plan and the accident; (2) discretionary approval of the plan prior to construction; and (3) substantial evidence supporting the reasonableness of the design. (*Hefner* v. *County of Sacramento* (1988) 197 Cal.App.3d 1007, 1014 [243 Cal.Rptr. 291], citing *Anderson* v. *City of Thousand Oaks* (1976) 65 Cal.App.3d 82, 88 [135 Cal.Rptr. 127].)

■ When design immunity is raised as a defense, the trial court must rule on whether the evidence is sufficient to support it. Whether the public entity asserting the defense has proven the three essential elements is a question of law for the trial court; it is error to submit a design immunity defense to a jury. (*Mozzetti* v. *City of Brisbane* (1977) 67 Cal.App.3d 565, 572 [136 Cal.Rptr. 751]; *Muffett* v. *Royster* (1983) 147 Cal.App.3d 289, 306 [195 Cal.Rptr. 73].)

■ On review, the question of whether "design immunity and each of its elements exist is an issue of law, i.e. the reviewing court must determine whether the [governmental entity] has met its burden of establishing as a matter of law all the elements of the defense of design immunity." (*Bane* v. *State of California* (1989) 208 Cal.App.3d 860, 867 [256 Cal.Rptr. 468], citing *Cameron* v. *State of California* (1972) 7 Cal.3d 318, 325 [102 Cal.Rptr. 305, 497 P.2d 777].)

█ Existence of the first element of the design immunity defense (causation) is not an issue in this appeal. As to the second element, appellants argue that the timing sequence of the lights was not included in the "design" or "plan" of the traffic signal system for Alum Rock because the timing was not determined in advance of its implementation.

█ The traffic signal system installed in this case necessarily includes operation of the lights. In other words, operation of the lights is integral to the system. When a part of an improvement is integral to its function, it must be considered to be within the scope of the design for that improvement, even if it is to be later formulated. A party may nevertheless challenge whether there was prior approval of that particular component, or part, of the design. We note, as a matter of significance, that the case of *Weiss* v. *Fote* (1960) 7 N.Y.2d 579 [200 N.Y.S.2d 409, 167 N.E.2d. 63], upon which the Legislature relied in enacting section 830.6, involved the timing of traffic signals. (See Cal. Law Revision Com. com., 32 West's Ann. Gov. Code (1980 ed.) § 830.6, p. 283 [Deering's Ann. Gov. Code (1982 ed.) § 830.6, p. 239].)

█ Appellants' further argument regarding the second element—prior approval of the timing plan or design—warrants more consideration. The evidence concerning this issue discloses the following. Generally, when the State Department of Transportation (Caltrans) receives a report that a particular intersection presents an accident problem, it investigates and determines whether the intersection meets federally established warrants for the installation of a traffic control signal. Caltrans prepares a project report, which includes the reasons a signal should be installed, its location, and a diagram or plan of the proposed project. The plan does not include a table prescribing timing of the signal. The report is then submitted for approval to the appropriate district director.

These steps were followed with respect to the Alum Rock signal system, which was installed in May 1984. The project report was prepared, submitted to and approved by the deputy director for Caltrans in San Francisco, as well as the electrical design engineer and local deputy director of public works. The signal lights were then constructed and installed as planned and approved.

Pursuant to Caltrans policy, once the signal system is constructed, a timing plan is developed by a member of its signal operations group. A preliminary plan is developed by an operator based on data concerning the intersection, i.e., the amount and speed of traffic, number of pedestrians and other conditions. Guidelines for timing systems set forth in the Caltrans traffic manual are utilized. The operator then takes the preliminary plan to the

intersection, programs it into the signals, and turns them on. The operator remains at the site and observes the signal(s) and how traffic responds to the various timing intervals. The operator may "fine tune" the timing system at this time, if it appears necessary. After these steps are taken, the operator prepares an official timing record for the signal, specifying the light intervals.

Thus, according to Caltrans operating procedures, the assigned signal operator is delegated the duty of designing and implementing the plan, based upon the data collected and his or her observations at the site. No additional approval of the timing sequence is provided. This is due to the nature of the timing process, which requires highly specialized, expert knowledge. A timing sequence cannot be designed with finality before it is implemented because an operator must observe the system in action before he or she can determine that it is appropriate. In fact, a signal operator inspecting a signal system at a later date may change a timing sequence on site if he or she determines such a change is necessary.

Thomas Wong was the signal operator who developed and implemented the timing plan at the Alum Rock intersection. Wong had 12 years' experience as a signal operator, and had timed as many as 150 new signal installations. He testified that he prepared a preliminary timing plan for the signal system after reviewing the project report, which included data regarding accident profiles, approach speeds, traffic volumes and pedestrian volumes. In doing so, he considered and applied the guidelines set forth in the Caltrans traffic manual. After setting the timing of the lights pursuant to his preliminary plan, Wong remained at the site and observed traffic for eight hours the same day, and three more hours the following day. He was then satisfied that the timing which he had programmed into the system was appropriate and working properly, and he returned to his office and made up the official timing record. Since then, the signal has been checked by operators and maintenance workers on a regular basis.

Appellants contend the design immunity defense was improperly invoked in this case because there was no prior approval of the timing sequence and also because it was not approved by anyone other than Wong.

The relevant language of section 830.6 provides: "Neither a public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of a construction of, or an improvement to, public property where such plan or design has been approved in advance of the construction or improvement by the legislative body of the public entity or by some other body or employee exercising discretionary authority to give such approval or

where such plan or design is prepared in conformity with standards previously so approved, . . ."

As earlier noted the nature of the element of the plan at issue here—the timing sequence of the lights—is such that it requires some observance in operation and does not readily lend itself to a full preimplementation determination. Accordingly, Caltrans has delegated the authority for designing and implementing the timing systems to employees who are experts within this specialized field. Although preliminary plans can be (and are) formulated, and basic guidelines are set forth in the Caltrans traffic manual, it is not until the timing sequence has been set and observed that it can be finally approved. The operator does not leave the site and prepare a timing record until he or she has studied the signal in action and is satisfied that it is working properly. Thus, the light intervals are approved before the public is left to rely upon the signals. We conclude, as did the trial court, that Wong's approval constituted prior discretionary approval as contemplated by section 830.6.

The cases cited by appellants do not persuade us otherwise. *Cameron* v. *State of California, supra,* 7 Cal.3d 318 and *De La Rosa* v. *City of San Bernardino* (1971) 16 Cal.App.3d 739 [94 Cal.Rptr. 175], both involved situations wherein the court determined that the cause of the accidents in question was not a feature of the design which was being asserted by the governmental entity as a basis for immunity. Plaintiffs' theory here is to the contrary. And in *Johnston* v. *County of Yolo* (1969) 274 Cal.App.2d 46 [79 Cal.Rptr. 33], the official who had discretionary authority to approve the design of a proposed curve in a road testified that although he did not believe the design was a safe one and that it did not meet minimum engineering standards, he had approved the project due to political pressure. The court found that this action did not constitute "approval" within the meaning of section 830.6. A sham approval is not an issue in this case.

A situation more analogous to the instant case is found in *Hefner* v. *County of Sacramento, supra,* 197 Cal.App.3d 1007. There, an intersection was designed by a civil engineer employed by the respondent's department of public works. The plan for the intersection did not designate placement of a limit line. After location of the stop sign was determined, a limit line was painted onto one of the roads, under supervision of the senior traffic supervisor, who made the decision about where the line should be placed at the time it was painted. The supervisor had been delegated discretionary authority to supervise the placement of limit lines within departmental standards. Although it was not called upon to so determine, the appellate court did note there was no dispute "that the design was approved by an employee . . . exercising discretionary authority." (*Id.* at p. 1014.)

Finally, appellants argue that section 830.6 should be interpreted to require approval by someone other than the person who develops the plan. While it may be prudent in many instances to have a third person approve a design or plan for an improvement, we do not believe it is always necessary, or that such review is compelled by law. Section 830.6 requires only that the project be approved by an "employee exercising discretionary authority to give such approval." There is no requirement that the approving employee be someone other than the person who prepares the plan or design.

■ Next, appellants contend that even if the timing system of the traffic signal is part of a prior approved plan, there is no substantial evidence that the plan is reasonable.

The intersection in question is referred to as "offset," meaning that Kirk and Fleming enter Alum Rock at different points (see appendix). As a result, the Alum Rock intersection, defined as the distance from outside crosswalk to outside crosswalk, is approximately 177 feet in length. It is considered a wide intersection. Although it is both wide and offset, the intersection is not considered unusual or complicated from a traffic engineering viewpoint. The posted speed limit is 40 miles per hour (mph), and the critical speed, defined as that at which 85 percent of the vehicles actually travel, is 41.8 mph. At 40 mph a car travels roughly 58 feet per second. Thus, it would take a car going 40 mph on Alum Rock approximately 3 seconds to clear the subject intersection.

The state traffic manual, utilized by signal operators, sets forth guidelines for timing traffic signals under various conditions. The length of the yellow interval is determined by the comfortable deceleration rate for a motorist at a given speed, and also takes into account a motorist's perception-reaction time. The suggested yellow interval when the approach speed is 40 mph is 3.5 seconds. The manual also provides for the use of an all red clearance interval following the yellow interval at very wide or offset intersections. It provides that red intervals ranging from .10 second to 2.0 seconds may be utilized.

Wong testified that he selected a four-second yellow change interval for westbound traffic on Alum Rock, adding an additional half second to the manual's suggested three-and-one-half-second interval to accommodate the higher critical speed and the nature of the intersection. He testified he used the extra half-second red interval because the intersection was both offset and wide. Thus, vehicles proceeding westbound on Alum Rock were given a total of four and one-half seconds to stop or clear the intersection once the light changed from green, before cross traffic would receive a green signal.

Thomas Schultz, a traffic engineering expert who testified for appellants, stated that this timing sequence constituted an unreasonable design because it included the possibility that a pedestrian would receive the walk signal before a vehicle which had legally entered the intersection would have cleared it. For example, a car entering the intersection on the second or third second of the yellow interval would only have two and one-half or one and one-half seconds to pass through the intersection before cross traffic (and pedestrians) received a green light. Schultz testified that this inherent pedestrian/vehicle conflict rendered the light sequence unreasonable from an engineering standpoint. He suggested that Wong should have used the maximum time intervals set forth in the traffic manual, five seconds of yellow and two seconds of the all red mode. This timing would have allowed all moving traffic to clear the intersection.

The state, in turn, presented two experts who testified in support of reasonableness of the design. Harold Garfield, a retired Caltrans traffic engineer with 31 years' experience in designing and timing traffic signals, testified that the system developed by Wong was in accordance with sound engineering principles, in compliance with the state traffic manual, and consonant with California traffic laws and policy.

Garfield testified that basic principles of traffic engineering are informed by both efficiency and safety considerations. He testifed that use of an all red clearance mode is generally disfavored because studies have shown that it leads to driver frustration which in turn results in motorists running yellow lights, taking more chances, and driving more recklessly at a given intersection. Garfield testified that all red intervals are utilized in less than 8 percent of the intersections in California. He also testified that the pedestrian/driver conflict which Schultz considered unreasonable occurs in nearly all of the intersections in California.

With respect to the specific intersection, Garfield testified that he believed the timing sequence was reasonable and appropriate. He noted that the four-second yellow interval complied with the standard set forth in the traffic manual, and that the additional half second was appropriate and took into effect a slight decline in the approach to the intersection. He also testified that the use of the all red mode was appropriate due to the nature of the intersection, and that the half second interval allowed ample time for traffic to clear in most situations. He stated his observation of the signal indicated that it was timed in such a way as to promote the safe and efficient flow of traffic.

Ed Rusak, another expert on traffic signal timing, also testified that in his opinion the timing sequence of the lights was reasonable and consistent with

good engineering practices. He agreed that sound traffic engineering necessarily involves consideration of efficiency as well as safety factors, which ultimately enhances the overall safety of an intersection. He also discussed the interplay of other factors which affect the determination of timing sequences, including the way motorists respond to a change to a yellow light from varying distances before the intersection, and also the perception/reaction times of both drivers and pedestrians to changes in signals.

In this case, for example, it would take a car going the speed limit of 40 mph about 3 seconds to clear the intersection. However, Bishop was traveling 35 mph when she struck James. A car going 35 mph travels approximately 51 feet per second. Thus, it would take an additional half second, or approximately three and one-half seconds, for her to clear the intersection. If Bishop entered the intersection on the last instant of yellow, she would not have cleared the intersection before James received the walk light, even if Schultz's suggested two-second red light had been in effect. The pedestrian reaction time must also be factored in, which means the time it takes for the pedestrian to register the signal has changed and begin to move. This can be anywhere from one-half to one and one-half seconds, according to the testimony presented. Depending on James's perception/reaction time, he might have been struck even under appellants' proffered timing system. The scenario changes each time depending on what point in the yellow interval the car enters the intersection, its speed, and the perception/reaction time of the pedestrian. The possible permutations of these factors appear endless, demonstrating that traffic signals cannot eliminate all traffic conflicts.

Thus is manifest the essential rule which traffic engineering reasonably relies on—both vehicular and pedestrian traffic must yield the right of way to all vehicles which are lawfully within an intersection when they receive a signal to proceed. (Veh. Code, §§ 21451, 21456.) The law anticipates some conflict between opposing pedestrians and vehicles legally authorized to proceed. In California, unlike some other states, the yellow change interval is utilized as a caution light, warning a driver that a red indicator will be shown immediately thereafter. A driver may enter the intersection on a yellow light, but not against a red light.

Considered against this backdrop, we conclude there is substantial evidence in support of the reasonableness of the timing of the signal system here at issue. According to the testimony, the plan was developed and implemented in accordance with prevailing relevant standards. ■ "The state is entitled to a defense of design immunity if there is any substantial evidence on which the approval can be reasonably based, . . ." (*Muffett* v.

*Royster, supra,* 147 Cal.App.3d 289, 306, citing *Mozzetti* v. *City of Brisbane, supra,* 67 Cal.App.3d 565.) Accordingly, the judgment is affirmed.

Capaccioli, J., and Bamattre-Manoukian, J., concurred.

(See p. 1384 for appen. A.)

APPENDIX A