[No. E026784. Fourth Dist., Div. Two. June 11, 2001.]

JAIMIE FULLER et al., Plaintiffs and Appellants, v.
DEPARTMENT OF TRANSPORTATION, Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I, III, IV, V, VI, and VII of the Analysis.

## COUNSEL

Forgie & Jacobs, Peter S. Forgie, Cynthia F. Biersteker; Law Offices of Michael Oran and Michael Oran for Plaintiffs and Appellants.

Bruce A. Behrens, Brelend C. Gowan, Richard A. Wehe, Gary A. Geren, Richard D. Birdsall, Roger Formanek and Jean Scherer for Defendant and Respondent.

## OPINION

**WARD, J.**—Plaintiffs and appellants Jaimie and Christopher Fuller, and Brooke, Jamie and Robin Knowles, filed actions for wrongful death when their decedents were killed in an automobile accident on Highway 395 near the community of Olancha in Inyo County. Plaintiffs sued the other motorists involved, as well as defendant and respondent State of California, Department of Transportation (hereafter Caltrans). The theory pled against Caltrans was liability for a dangerous condition of public property. The trial court granted Caltrans's motion for summary adjudication of issues with respect to some aspects of design immunity. After the close of plaintiffs' case, the court also granted Caltrans's motion for nonsuit. Plaintiffs appeal from the judgment of nonsuit. They argue that the court erred in granting summary adjudication of issues, that the court erred in excluding certain

evidence at trial, and in granting the motion for nonsuit. We shall affirm the judgment.

FACTS AND PROCEDURAL HISTORY

Olancha is a small community located south of Bishop, California, on Highway 395. State Highway 190, the major road to Death Valley, abuts Highway 395 in the Olancha area. On the morning of September 25, 1997, Rudi Kramer, a German tourist, was driving a motor home on State Highway 190. When State Highway 190 intersected and ended at Highway 395, Kramer turned his motor home southbound onto Highway 395. Because he was confused about his route, Kramer stopped his motor home, at approximately the 34.50 milepost of Highway 395, to consult maps. Kramer believed he stopped his motor home completely off the roadway on the shoulder.

Meanwhile, Leonard Smith was driving his motor home southbound on Highway 395. Approximately 800 feet north of where Kramer's motor home was stopped, Smith approached a curve in the roadway, driving at approximately 60 to 65 miles per hour. According to Smith, Kramer's motor home was stopped in the middle of the southbound traffic lane. When Smith realized that Kramer's motor home was actually stopped, he braked to a halt behind Kramer.

Hilario Chairez was driving a tractor-trailer rig southbound on Highway 395. He had been following Smith's motor home for some time, staying approximately 300 feet behind Smith's vehicle. When Chairez entered the Olancha curve, his attention was diverted to the Olancha post office and a pickup truck that appeared to be preparing to enter the roadway from the post office parking lot. When Chairez redirected his attention to the roadway in front of him, he saw the Smith motor home braking to a stop for no apparent reason. Chairez slammed on his brakes; his truck jackknifed and skidded into the northbound lane.

William Fuller and James Knowles, the decedents, were driving northbound on Highway 395. When Chairez's truck rig skidded into the northbound lane, the decedents' vehicle collided head-on with Chairez's truck. The decedents were killed by the impact.

Each decedent's survivors filed a separate complaint in Los Angeles County. The actions were consolidated on November 6, 1998. After their initial complaints, plaintiffs also filed first amended complaints to name Caltrans as a defendant. Caltrans moved the venue to Inyo County.

On July 26, 1999, Caltrans moved for summary adjudication of issues, to the extent that plaintiffs' cause of action for dangerous condition of public property was predicated upon the impropriety of the posted speed limit (55 miles per hour). The trial court granted the motion.

During trial, Caltrans also moved for summary adjudication of an additional theory of liability for the dangerous condition of public property. To the extent that plaintiffs' cause of action was predicated upon the inadequacy of the roadway shoulder, Caltrans claimed immunity for the shoulder design. The court granted this motion also.

Because of the court's rulings on governmental immunity, various items of plaintiffs' proffered evidence were not admitted at trial.

At the close of plaintiffs' case, Caltrans moved for nonsuit. The trial court found against plaintiffs and entered a judgment of nonsuit.

Plaintiffs now appeal. They argue (1) the court erred in finding design immunity relating to speed limits or speed zone issues, (2) the court erred in finding design immunity for the road shoulder, (3) the alleged design deficiencies constituted a motorist trap, which is an exception to design immunity, (4) the court erred in excluding various items of evidence, and (5) the court erred in granting nonsuit.

ANALYSIS

I. *Reversal Is Not Required for Granting "Summary Adjudication of Issues" Which Did Not Dispose of an Entire Cause of Action\**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II. *The Design Immunity Applies to the Setting of Speed Limits in This Case*

A. *Standard of Review*

■ "The State is not liable for a defect in the design plan for a public improvement if it can establish the three elements that constitute the design immunity affirmative defense. The State must show: (1) a causal relationship between the project design and the accident; (2) discretionary approval of the design prior to construction; and (3) substantial evidence supporting the reasonableness of the design. [Citations.] The trial court applies the deferential 'substantial evidence' standard traditionally employed by reviewing

---

*See footnote, *ante*, page 1109.

courts to determine whether any reasonable state official could have approved the challenged design. [Citation.] The rationale underlying design immunity is to prevent a jury from reweighing the same factors considered by the governmental entity which approved the design. [Citation.] Whether each element of design immunity exists is a question of law."[7] We review questions of law de novo.[8]

B. *The Elements of Design Immunity Were Met for the Setting of the Speed Limit*

1. *Was the Project Design a Cause of the Accident?*

The entire thrust of plaintiffs' assertions both at trial and on appeal is that speed through Olancha was too high. The only reason to admit any evidence concerning speed limits, speed advisory warnings, and other matters related to speed would be to show that Caltrans's decisions concerning speed, including setting of the speed limit, somehow caused this accident. Otherwise, no evidence concerning speed or speed limit would be relevant. Caltrans relied on plaintiffs' pleadings to establish the necessary assertion of causation. If, as plaintiffs suggest, Caltrans failed to prove the first element of design immunity—causation—the result would not be that evidence of the speed limit would be admissible. Rather, without any causal connection, evidence concerning the speed limit would be completely irrelevant and still properly excluded at trial. Plaintiffs cannot now deny the efficacy of their allegations.

2. *The "Design" Was Discretionarily Approved Before Construction*

 Plaintiffs urge that the setting of a speed limit is not subject to the design immunity defense, because it has "nothing to do with the construction of, or improvements to, public property." We cannot agree with this assessment. Without question, roadways and roadway construction are improvements to public property which are subject to design immunity.[9] Roads are intended to carry vehicular traffic; vehicular traffic movement necessarily contemplates safe and efficient speeds at which the vehicles will travel. "Design speed," such as the safe speed at which a curve may be negotiated,

---

[7]*Alvarez v. State of California* (1999) 79 Cal.App.4th 720, 727-728 [95 Cal.Rptr.2d 719].

[8]*People v. Louis* (1986) 42 Cal.3d 969, 985 [232 Cal.Rptr. 110, 728 P.2d 180], disapproved on other grounds in *People v. Mickey* (1991) 54 Cal.3d 612, 672, footnote 9 [286 Cal.Rptr. 801, 818 P.2d 84].

[9]Cf. *Levin v. State of California* (1983) 146 Cal.App.3d 410 [194 Cal.Rptr. 223]; *Anderson v. City of Thousand Oaks* (1976) 65 Cal.App.3d 82 [135 Cal.Rptr. 127].

is an inherent part of roadway design.[10] The speeds at which vehicles travel, and speed regulations, are part and parcel of the safety features of a road improvement. We conclude, therefore, that if a speed limit is set in accordance with some plan and discretionarily adopted by an employee with authority to do so, the setting of a regulatory speed limit is subject to design immunity analysis.

Our conclusion is bolstered by *Uyeno v. State of California*,[11] concerning the timing of traffic lights. There, a 10-year-old boy was killed in a pedestrian crosswalk. The plaintiffs alleged that the traffic light sequence should have used a two-second all-red mode instead of a half-second all-red mode, to allow vehicular traffic to clear before pedestrians were allowed to proceed. The plaintiffs argued that the timing of the signals was not a "plan" or "design" subject to the design immunity because the timing was not determined in advance of its implementation.[12] The court ruled, however, that the operation of the traffic lights, including the timing, was integral to the system. "When a part of an improvement is integral to its function, it must be considered to be within the scope of the design for that improvement, even if it is to be later formulated."[13]

In terms of prior approval, the evidence in *Uyeno* showed that a timing plan was prepared after the traffic signals were constructed, based upon usage data and prepared guidelines. Inasmuch as signal timing "requires some observance in operation and does not readily lend itself to a full preimplementation determination,"[14] the signal operator's on-site approval and later preparation of a report satisfied the requirement of prior discretionary approval. At least "the light intervals are approved before the public is left to rely upon the signals."[15]

Similarly, the setting of an appropriate regulatory speed limit is integral to the functioning of the roadway. Again, "prior discretionary approval" encompasses decisions that must be made based upon observance in operation. Here, Caltrans's decision to set the regulatory speed limit at 55 miles per hour was based upon an on-site speed study, prepared according to the Caltrans manual, and included "prevailing speed as determined by traffic engineering measurements, accident records, as well as highway, traffic, and roadside conditions not readily apparent to the driver." Caltrans's employee approved the speed zone plan pursuant to the 1996 speed study. This approval was sufficient for purposes of design immunity under *Uyeno*.

[10]Cf. *Anderson v. City of Thousand Oaks, supra*, 65 Cal.App.3d 82, 92.
[11]*Uyeno v. State of California* (1991) 234 Cal.App.3d 1371 [286 Cal.Rptr. 328] (*Uyeno*).
[12]*Uyeno, supra*, 234 Cal.App.3d 1371, 1377.
[13]*Uyeno, supra*, 234 Cal.App.3d 1371, 1377.
[14]*Uyeno, supra*, 234 Cal.App.3d 1371, 1379.
[15]*Uyeno, supra*, 234 Cal.App.3d 1371, 1379.

Plaintiffs argue that, inasmuch as no reported case has ever applied the design immunity to the decision to set a certain speed limit, the design immunity protection must not apply. While we agree that no reported case has, so far as our research shows, yet applied the design immunity to the speed limit regulatory decision, the state is nevertheless immune, by parity of reasoning with *Uyeno*.

Plaintiffs point out that, in other cases, courts have subjected the speed limit setting decision to judicial scrutiny. The cases cited are not, however, apposite.

In *Harland v. State of California*,[16] the court permitted evidence of a dangerous condition of public property for a bridge, including expert testimony that the posted speed limit was too high, considering other conditions on the bridge, such as the lack of shoulder width, lack of a median divider, a curve in the bridge itself, and so on. Moreover, there was evidence in *Harland* that the California Highway Patrol had recommended reducing the speed limit to 50 or 55 miles per hour. *Harland* is inapplicable here. First, the state had notice of changed circumstances. Second, there is no hint that the state had offered any evidence concerning design immunity for the decision setting the speed limit on the bridge. There was no showing, for example, that the speed limit had been set by following the Caltrans manual and conducting a speed study. Cases are not authority for propositions not considered.[17] Third, the main mechanism of dangerous condition was the lack of a median barrier. *Harland* does not aid plaintiffs.

Likewise, *Anderson v. City of Thousand Oaks* is inapposite. There, the decedent was killed when the car in which he was riding failed to negotiate a curve on a roadway that had been open for one month. The public entity moved for summary judgment on the question of design immunity. The appellate court agreed with the trial court that the defense of design immunity, as an initial proposition, had been established. The opposing affidavits did indicate that the design speed of the curve was 45 miles per hour; with other factors, the curve could safely be negotiated at a maximum speed of 55 miles per hour, but the road was not safe at the prevailing speed limit of 65 miles per hour. The appellate court determined that there was sufficient evidence to show that the banking of the curve was part of the design, and that the design plans included consideration of warning and other signs for the curve. The court did reverse the summary judgment, however, because there was a triable issue of fact whether the public entity had notice, in the

---

[16]*Harland v. State of California* (1977) 75 Cal.App.3d 475 [142 Cal.Rptr. 201].
[17]*Roberts v. City of Palmdale* (1993) 5 Cal.4th 363, 372 [20 Cal.Rptr.2d 330, 853 P.2d 496].

one month of the road's use, that it was in a dangerous condition as designed.[18]

The *Anderson* court's receipt of evidence, in the moving and opposing papers on summary judgment, concerning the speed limit and its relation to the design of the curve in the road, does not indicate that speed limit setting is not part of roadway design. First, the trial court received the evidence in a limited context—motion for summary judgment—and did not admit such speed limit evidence at trial. Second, nothing in *Anderson* involved proof that the speed limit itself had been set as part of a speed survey or other plan. Third, the critical issue was notice of a dangerous condition of the roadway; even if the public entity was immune for the decision to set a certain speed limit for the roadway, it might still have had notice that the curved portion of the roadway was in a dangerous condition at the speed as set, and to have incurred additional duties to warn or correct the dangerous condition. *Anderson* does not support the proposition that design immunity does not apply to the setting of speed limits for a roadway according to a speed survey plan.

We also disagree with plaintiffs' assertion that protection for the setting of speed limits does not come within the rationale for granting design immunity. The design immunity defense " 'prevent[s] a jury from simply reweighing the same factors considered by the governmental entity which approved the design.' "[19] The immunity principle is rooted in the separation of powers doctrine, that the judicial branch should not interfere in the discretionary decisions of the Legislature or the executive branch.[20] The setting of speed limits requires the exercise of engineering and management expertise: i.e., executive discretion.

Plaintiffs protest that the executive branch's setting of speed limits is routinely scrutinized by the courts in the context of speeding tickets: under Vehicle Code sections 40802 and 40803, the state must produce evidence of a recent speed and traffic survey to justify speed limit setting when a ticket is issued pursuant to a radar reading. We find plaintiffs' argument unpersuasive. First, the scrutiny is very limited—it applies only to tickets issued by radar reading. Speed limit studies are not required for tickets issued based upon speedometer pacing. Second, the purpose is limited—it is to prevent speed traps, or speed limits set artificially low, when completely unjustified by the speed and traffic studies. Third, the context is completely different—in a speeding ticket challenge, no one is seeking to charge the public

---

[18]*Anderson v. City of Thousand Oaks, supra,* 65 Cal.App.3d 82, 89-91, 91-92.

[19]*Cameron v. State of California* (1972) 7 Cal.3d 318, 326 [102 Cal.Rptr. 305, 497 P.2d 777]; *Baldwin v. State of California* (1972) 6 Cal.3d 424, 432, footnote 7 [99 Cal.Rptr. 145, 491 P.2d 1121].

[20]See *Higgins v. State of California* (1997) 54 Cal.App.4th 177, 185 [62 Cal.Rptr.2d 459].

entity with financial liability for its discretionary decision in setting the speed limit. Allowing speeding ticket challenges does nothing to undermine the rationale for affording the public entity immunity from tort liability for the setting of speed limits according to an approved procedure, supported by traffic and speed studies.

### 3. *The Approval Was Reasonable*

■ Plaintiffs assert that the approval of the 55-mile-per-hour speed limit was unreasonable because the speed and traffic study did not take account, as required by Vehicle Code section 627, of highway, traffic and roadside conditions not readily apparent to drivers. To the contrary, Caltrans's declarations averred that the speed study did take account of "prevailing speed . . . , accident records, as well as highway, traffic and roadside conditions not readily apparent to the driver. The survey included determinations of alignment, gradient, roadway width, number of striped lanes, type of diversion strip, traffic signals data, average daily traffic, [observed speeds], and existing marked/signed speed zone limitations." Caltrans's witnesses averred that the speed plan was consistent with prevailing standards of design and safety. The speed plan was approved by Caltrans's traffic engineer. The trial court properly concluded the approval was reasonable.

■ Because the setting of the speed limit was subject to design immunity, plaintiffs were not entitled to place evidence before the jury suggesting that the state should be liable for its speed-limit-setting decision.

III.-VII.*

· · · · · · · · · · · · · · · · · · · · · · · · · · · ·

### DISPOSITION

For the reasons stated, the judgment is affirmed.

McKinster, Acting P. J., and Richli, J., concurred.

Appellants' petition for review by the Supreme Court was denied September 12, 2001. Werdegar, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante*, page 1109.