[No. A131453. First Dist., Div. Two. Dec. 20, 2012.]

GRACE DAMMANN et al., Plaintiffs and Appellants, v.
GOLDEN GATE BRIDGE, HIGHWAY AND TRANSPORTATION
DISTRICT, Defendant and Respondent.

336

**COUNSEL**

The Boccardo Law Firm, John C. Stein and B.E. Bergesen III for Plaintiffs and Appellants.

Hanson Bridgett, Kimon Manolius, Julia H. Veit and Christine Hiler for Defendant and Respondent.

**OPINION**

**LAMBDEN, J.**—Plaintiffs Grace Dammann and Sabrina Schroeder-Dammann (collectively, Dammann), appeal from the trial court's grant of summary judgment in favor of defendant Golden Gate Bridge, Highway and Transportation District (District). Dammann alleged in their suit that the District, as the owner of a public property on which a dangerous condition existed, was liable for personal injuries they incurred in a cross-over accident on the Golden Gate Bridge (Bridge). They argue the trial court erred in ruling that the District was immune from their suit based on the affirmative defense of design immunity, related to the District's 1985 decision not to install moveable median barriers (MMB's) on the Bridge.

Among other things, Dammann argues that the District lost this design immunity when it became aware by 1998 that certain technological advances in MMB's made it appropriate to install an MMB on the Bridge, which

advances were "changed physical conditions" that would have eliminated the existing dangerous condition on the Bridge, i.e., the lack of a median barrier. Dammann also argues that a 1979 amendment to Government Code section 830.6 (section 830.6) was such that a triable issue of fact existed regarding what design could reasonably be approved in light of these technological advances.

We conclude, based on the analyses and determinations by our Supreme Court in *Baldwin v. State of California* (1972) 6 Cal.3d 424, 438 [99 Cal.Rptr. 145, 491 P.2d 1121] (*Baldwin*) and *Cornette v. Dept. of Transportation* (2001) 26 Cal.4th 63 [109 Cal.Rptr.2d 1, 26 P.3d 332] (*Cornette*), as well as that of numerous appellate courts, that the technological advances relied on by Dammann do not constitute the "changed physical conditions" required to end design immunity because such physical conditions must exist at the public property in question, and that this requirement was not affected by the 1979 amendment to section 830.6 so as to create a triable issue of fact in this case. Therefore, we affirm the judgment. Given our conclusions, we need not address the remainder of Dammann's arguments.

## BACKGROUND

The parties do not dispute the facts we recite herein for the purposes of District's summary judgment motion. In July 2009, Dammann filed a complaint in Marin County Superior Court. Dammann alleged that on May 21, 2008, while they were travelling northbound on the Bridge, their vehicle was struck by a southbound vehicle that had crossed over to the northbound lane and struck their vehicle head on. Dammann alleged that various dangerous conditions existed on the Bridge on the date of the accident, including the District's failure to install an affordable barrier device with full knowledge of the ongoing dangers presented to motorists by virtue of cross-over collisions.

Dammann's complaint further alleged that a workable, affordable, and fully tested MMB would have eliminated cross-over accidents, had been available for more than 15 years, and had been recommended for installation by competent traffic engineers. Dammann further alleged that the District had notice of the dangers created by the lack of an MMB, but unreasonably and negligently refused to install it, resulting in a dangerous condition that caused Dammann's accident and resulting severe personal injuries. Dammann sought compensatory damages pursuant to the claim that the District owned public property on which a dangerous condition existed.

The District answered and asserted as one affirmative defense that it had design immunity pursuant to section 830.6. In February 2009, the District filed an amended motion for summary judgment or, in the alternative,

summary adjudication. One argument made by the District was that it was immune from suit due to design immunity that it had retained for its 1985 decision not to install an MMB, as recognized in *Sutton v. Golden Gate Bridge, Highway & Transportation Dist.* (1998) 68 Cal.App.4th 1149 [81 Cal.Rptr.2d 155] (*Sutton*), and that there were no changed physical conditions that had caused it to lose this immunity.

Dammann opposed the motion, asserting that the District had lost its design immunity due to, among other things, technological advances in MMB designs and their installation on two comparable bridges, the Auckland Harbour Bridge in New Zealand and the Coronado Bridge in San Diego, California. Dammann asserted that the data from these two bridges and new studies showed that in 1985 the District decided not to install MMB's based on the false conclusions that they would result in much higher accident rates and create various secondary problems, and demonstrated that the Bridge was in a dangerous condition due to the lack of an MMB. Dammann further asserted that the District knew of these technological advances and approved of them for installation on the Bridge by 1998, knew the lack of an MMB created a dangerous condition on the Bridge, and had a reasonable amount of time to perform the necessary remedial work and obtain funding before Dammann's accident in 2008.

The trial court granted summary judgment, including on the ground that Dammann had failed to submit adequate evidence of "changed physical conditions" sufficient to result in a loss of design immunity pursuant to *Cornette, supra*, 26 Cal.4th 63. The court subsequently entered judgment in the District's favor. Dammann filed a timely notice of appeal.

## DISCUSSION

Dammann presents four categories of arguments in their appeal. They argue that (1) the technological advances in MMB's that they relied on in opposition to the District's summary judgment motion constituted the changed physical conditions required to defeat an affirmative defense of design immunity; (2) a 1979 amendment to section 830.6 was such that a triable issue of fact existed regarding what design could reasonably be approved in light of these advances; (3) the Bridge was in a dangerous condition because of the lack of a median barrier; and (4) the trial court erred in sustaining the District's evidentiary objections to certain evidence. We address Dammann's first two arguments and, because we conclude they lack merit and are dispositive, do not address Dammann's third and fourth arguments.

## I. *Standard of Review*

A trial court properly grants summary judgment if the record establishes no triable issue as to any material fact and the moving party is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A party moving for summary judgment "bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493], fn. omitted (*Aguilar*).) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Ibid.*, fn. omitted.) "A defendant bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto. [Citation.]" (*Ibid.*)

Generally, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . . A prima facie showing is one that is sufficient to support the position of the party in question. [Citation.]" (*Aguilar, supra,* 25 Cal.4th at pp. 850–851.) Although the burden of production shifts, the moving party always bears the burden of persuasion. (*Id.* at p. 850.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Ibid.*)

The standard of review for an order granting or denying summary judgment is de novo. (*Aguilar, supra,* 25 Cal.4th at p. 860.) We are not bound by the trial court's stated reasons for granting summary relief, as we review the trial court's ruling, not its rationale. (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878 [116 Cal.Rptr.2d 158].) In determining whether the parties have met their respective burdens, we consider "all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116].) We view the evidence in the light most favorable to plaintiffs as the parties opposing summary judgment, strictly

scrutinizing defendants' evidence in order to resolve any evidentiary doubts or ambiguities in plaintiffs' favor. (*Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 64 [74 Cal.Rptr.3d 108, 179 P.3d 905].)

## II. *Changed Physical Conditions*

Dammann first argues that the trial court incorrectly adopted one of two District arguments to conclude that technological advances made regarding MMB's between 1985 and 1998 did not constitute "changed physical conditions." According to Dammann, the first District argument, that technological advances cannot constitute changed circumstances, was "ostensibly abandoned." The District's second argument, that only an increased accident rate will satisfy the changed physical conditions requirement, was adopted by the court. Dammann contends this argument is unsupported by any law, requiring reversal.

The District responds with a number of arguments, including that the trial court correctly held that technological advances did not constitute changed physical conditions. The District argues this conclusion is supported by the law and public policy, and that no cases have held to the contrary. In their reply brief, Dammann acknowledges this was a ruling of the trial court but disagrees that it is correct.

We conclude that, as a matter of law, the technological advances regarding MMB's relied on by Dammann did not constitute the "changed physical conditions" required to defeat an affirmative defense of design immunity. Accordingly, the trial court did not err regarding this dispositive issue.

### A. *The Proceedings Below*

In its motion for summary judgment, the District asserted that it had retained design immunity in the absence of any evidence of a change in physical conditions on the Bridge. Among other things, the District contended that "[t]here has been no change in the physical condition of the [Bridge's] traveled way since the Deck Replacement Project was approved in 1985." Dammann disputed this contention, alleging "that there are changed physical conditions within the meaning of *Cornette* which depends on many factors, including new technological advances and studies and data obtained by the District between 1985 and 1998. New technology is a changed physical condition which was known to the District by at least 1997." The District argued that such alleged changes were not changed conditions under the law and cited law in support of their position.

In their opposition, Dammann asserted as undisputed facts that a two-foot MMB system was opened on the Coronado Bridge in April 1993. Dammann further asserted that a 1996 study indicated this MMB system had eliminated cross-over accidents on the Coronado Bridge, and that the accident rate had decreased 28 percent and the injury and fatality accident rates had decreased 38 percent.

Dammann also asserted as undisputed facts that a two-foot MMB had been installed on the Auckland Harbour Bridge in 1990, that this had eliminated cross-over accidents, that the accident rate had decreased by 23 percent and the injury and fatal accident rates had decreased by 42 percent.

Dammann further asserted as undisputed facts that a 1997 study had concluded that a one-foot MMB was appropriate for the Bridge, that California's Department of Transportation had favored this installation, that the responsible District engineer had recommended its installation in 1998, and that the District had agreed to proceed with such an installation in May 1998. Dammann further contended that by August 1998, the District was aware that the lack of an MMB created a dangerous condition on the Bridge, and that the period from 1998 to 2008 had been a reasonable time for the District to perform the necessary remedial work and obtain funding.

Dammann also filed a supplemental memorandum to further address the District's contention that technological advances do not constitute changed conditions as a matter of law, and the District responded with a defense of its position.

The court subsequently granted the District's motion for summary judgment. The court stated, "[Dammann] fail[ed] to raise a triable issue of material fact to show that the District has lost its design immunity due to a *change in physical condition* that has created a dangerous condition on the [Bridge] because of the lack of a median barrier," relying on *Cornette, supra*, 26 Cal.4th at page 72. The court further determined that "[t]*he weight of authority* does *not* support [Dammann's] theory that changes in technology allowing the development of a [one-foot] wide [MMB], the District's approval of a [one-foot] MMB project in 1998 (never completed), and the successful use of the [two-foot] MMB being on the Coronado Bridge in San Diego and the Auckland Harbor Bridge in New Zealand establish[ed] the first element for loss of design immunity, i.e. that the plan or design has become dangerous because of a *change in physical conditions*."

The trial court further found that the original design "arguably can be made safer through improved technology is 'irrelevant' toward meeting the standard for loss of design immunity unless it can be shown that changed physical conditions make the original design dangerous. [Citation.] The *material facts* with respect to loss of design immunity when dealing with the absence of a median barrier are increased traffic volume and increased or aberrant accident rates (and increased speed, if applicable)." Consistent with this view, the court ruled that an expert declaration regarding the severity of cross-over accidents had "little relevance in this instance where the issue is whether *circumstances have changed* due to *increased accident rates* since the original bridge design was approved."

## B. *Dammann's Claim of "Changed Physical Conditions"*

Dammann's appellate argument obscures the fact that an independent basis for the trial court's order granting summary judgment was that the technological advances relied on by Dammann did not constitute "changed physical conditions." The court was correct, as we will now discuss.

### 1. *The Law Regarding "Changed Physical Conditions"*

In 1972, in *Baldwin, supra,* 6 Cal.3d 424, our Supreme Court carved out an exception to its previous holding that "design immunity remained intact even though changed circumstances had clearly revealed the defects of the plan." (*Id.* at pp. 426–427.) The court held that "where a plan or design of a construction of, or improvement to, public property, although shown to have been reasonably approved in advance or prepared in conformity with standards previously so approved, as being safe, nevertheless in its actual operation under *changed physical conditions* produces a dangerous condition of public property and causes injury, the public entity does not retain the statutory immunity from liability conferred on it by section 830.6." (*Id.* at p. 438, italics added.)

In 1979, the Legislature amended section 830.6, including adding the following: "Notwithstanding notice that constructed or improved public property may no longer be in conformity with a plan or design or a standard which reasonably could be approved by the legislative body or other body or employee, the immunity provided by this section shall continue for a reasonable period of time sufficient to permit the public entity to obtain funds for and carry out remedial work necessary to allow such public property to be in conformity with a plan or design approved by the . . . public entity . . . or

with a plan or design in conformity with a standard previously approved by such legislative body . . . or employee." (§ 830.6; see *Bane v. State of California* (1989) 208 Cal.App.3d 860, 870 [256 Cal.Rptr. 468] (*Bane*).)

Courts subsequently considered whether or not this 1979 amendment, by its reference to public property that "may no longer be in conformity with a plan or design or a standard which reasonably could be approved," eliminated the *Baldwin* requirement that a party establish "changed physical conditions" in order to defeat a defense of design immunity. In *Bane, supra,* 208 Cal.App.3d 860, the Fifth Appellate District concluded that it did. The *Bane* court stated, "Although the . . . amendment . . . could have been drafted with more clarity, a reasonable, commonsense interpretation . . . is that once the public entity has actual or constructive notice that his property may no longer be in conformity with a reasonable design or plan, the [design] immunity nonetheless will continue for a reasonable period of time to allow the entity to obtain funds and to carry out remedial work to bring the property into conformity with the *reasonable* design or plan." (*Id.* at p. 870.) The court further concluded that "the amendment nullified the *Baldwin* language requiring a change in physical conditions before an approved design may be deemed unreasonable. . . . We do not read *Baldwin* as limiting the termination of immunity to only those cases which involve a change of the physical conditions of the property. Furthermore, in drafting the 1979 amendment to section 830.6, the Legislature is presumed to have been aware of the *Baldwin* holding, yet it did not limit the loss of immunity to changed physical conditions which result in a dangerous condition. Rather, the amendment language is unlimited; thus, the amendment should be construed to mean that immunity is lost if the subsequent history shows the design was unreasonable for any reason once the public entity has notice of the dangerous condition and has a sufficient time period to remedy it. No public policy is served by continuing to immunize the public entity for a plan after it becomes clear that its design is no longer reasonable and an opportunity to make a change is afforded." (*Id.* at p. 871.)

*Bane,* however, stood alone among appellate courts interpreting the 1979 amendment to section 830.6. In *Compton v. City of Santee* (1993) 12 Cal.App.4th 591 [15 Cal.Rptr.2d 660] (*Compton*), the Fourth Appellate District disagreed with *Bane*'s interpretation. The trial court granted summary judgment to the City of Santee against a plaintiff who alleged that an intersection located near a bridge constituted a dangerous condition. (*Id.* at pp. 594–595.) The appellate court found design immunity had vested (*id.* at pp. 596–597), and that there was no triable issue of fact regarding *Baldwin*'s changed physical conditions requirement, since the plaintiff "made no factual showing of any change in conditions between the time the plan was approved and the time of the accident." (*Id.* at pp. 598–599.)

The *Compton* court rejected the holding in *Bane* that a change in circumstances need not be shown, finding it "to be fundamentally inconsistent with the objective of section 830.6, which provides for immunity if the plan *could have been* deemed reasonable when approved. The Legislature, by its 1979 amendments [citation], directed that immunity, once vested, is forfeited only if the public entity has received notice that the plan *'may no longer* be in conforming with a plan . . . which reasonably could be approved. . . .' (§ 830.6, italics added.)" (*Compton, supra,* 12 Cal.App.4th at pp. 598–599, fn. omitted.) The *Compton* court agreed with a legal commentator that the "proper interpretation of the 1979 amendment" was that " '[i]nterpreted literally . . . [it] does not define the circumstances *under which the design immunity is lost*; rather, it specifies the circumstances *under which it may be retained.*" (*Id.* at p. 599, fn. 5.) The court concluded that *Baldwin* remained the governing law. (*Ibid.*)

In *Grenier v. City of Irwindale* (1997) 57 Cal.App.4th 931 [67 Cal.Rptr.2d 454] (*Grenier*), the Second Appellate District agreed with *Compton*. After noting that the language of the 1979 amendment was ambiguous, the *Grenier* court concluded that "[n]othing in the legislative history of the 1979 amendment reflects an intent to expand *Baldwin* and provide for the loss of design immunity in a situation other than changed physical conditions. Instead a review of the legislative history indicates the amendment was intended to respond to *Baldwin* by providing a reasonable extension of the immunity when, under the holding of *Baldwin,* that immunity otherwise would be lost." (*Grenier,* at p. 944.) As support for this view, the *Grenier* court quoted a 1979 letter by Assemblyman John Knox to the Governor regarding the legislation (Assem. Bill No. 893 (1979–1980 Reg. Sess.)), which stated, " 'Although the staff of the Joint Committee on Tort Liability agreed with *Baldwin,* it felt there should be some recognition of the practical limitations which have been imposed upon governments by Article XIII A of the California Constitution (Proposition 13) and ever increasing liability insurance costs.' " (*Ibid.*)

In *Dole Citrus v. State of California* (1997) 60 Cal.App.4th 486 [70 Cal.Rptr.2d 348] (*Dole Citrus*), the Fourth Appellate District reviewed whether an overcrossing that had been built according to then existing highway standards was nonetheless later maintained in a dangerous condition in light of a change in certain design standards. In the course of its evaluation, the *Dole Citrus* court, relying on *Baldwin* and *Grenier,* summarized the state of the law as follows: "[E]vidence of changed conditions must be evidence that *physical conditions at a specific location* have changed in such a manner that the original design has created a dangerous condition of which the entity has notice." (*Dole Citrus,* at p. 494, italics added; see *Mirzada v. Department of Transportation* (2003) 111 Cal.App.4th 802, 808 [4 Cal.Rptr.3d 205] [Third App. Dist.], quoting *Dole Citrus.*)

In 1998, in *Sutton, supra,* 68 Cal.App.4th 1149, Division Four of this district considered circumstances and arguments very similar to those made in the present case, and rejected them, in part because it agreed with *Compton* and *Grenier* that a party must show changed physical conditions in order to defeat a design immunity defense. *Sutton* is relevant to understand both the present state of the law regarding changed physical conditions and the history of the District's decisions regarding MMB's, and therefore merits considerable discussion.

Sutton, like Dammann, was involved in a cross-over accident on the Bridge. His truck, going northbound, was sideswiped, causing it to cross the median and enter the southbound lane, where it hit a pickup truck head on, killing the pickup truck's driver and resulting in serious injuries to Sutton. (*Sutton, supra,* 68 Cal.App.4th at pp. 1153–1154.) Sutton sued the District, alleging that the lack of a median barrier on the Bridge constituted a dangerous condition of public property. (*Id.* at p. 1154.) The District moved for summary judgment based on its design immunity and the trial court granted the motion. (*Id.* at p. 1154.)

The *Sutton* court reviewed the history, dating back to 1979, of the District's decisions not to install a median barrier as part of the Bridge Deck Replacement Project (Project) (the same Project involved in the present case), as well as the District's evaluation of four MMB systems. The District retained a study of four median barrier concepts by the engineering firm of Sverdrup & Parcel, which was independently reviewed by NASA/Ames Research Center in consultation with Lawrence Livermore Laboratories. (*Sutton, supra,* 68 Cal.App.4th at p. 1160.) Acting on the NASA/Ames recommendation, the District subsequently retained the Traffic Institute of Northwestern University to evaluate the effects of barrier systems on traffic safety and capacity on the Bridge. (*Ibid.*) The Traffic Institute concluded that an MMB system was inappropriate for the Bridge. (*Ibid.*) It opined: " '[T]he proposed [MMB] system is a useful device and [we] can foresee numerous important applications which would improve traffic safety and traffic operations. However, due to the unique characteristics and conditions represented by the [Bridge] and its approaches, and especially because of the restricted sight distance that would result from the installation of such a barrier on the curved approaches, it is our opinion that the proposed [MMB] would be inappropriate in this application. [¶] This conclusion is based on a combination of several factors. The proposed [MMB] would be effective in eliminating nearly all cross-over accidents and in reducing the frequency of fatal accidents. However, the frequency of fatal accidents is already quite small and some fatal accidents would be expected to occur even with a barrier in place. The benefits of such reductions in fatal accidents must be balanced against the expected increases in frequency of injury and property-damage accidents which would be expected if a [MMB] were implemented. We do

not believe that the expected increases in injury and property-damage accidents can be justified by the expected reduction in fatal accidents which would occur if the proposed [MMB] were implemented.' " (*Sutton, supra,* 68 Cal.App.4th at pp. 1160–1161.)

The District, relying on the Traffic Institute report, "determined that [an MMB] was inappropriate for the [B]ridge." (*Sutton, supra,* 68 Cal.App.4th at p. 1161.) The *Sutton* court concluded that "[g]iven the extensive analysis of median barriers conducted by the District and its reliance on the expert opinions of several traffic and transportation engineers, substantial evidence supports the reasonableness of the District's decision not to install a median barrier as part of the Project." (*Ibid.*) The Project was completed in 1985. (*Ibid.*)

Sutton argued that "technological advances in the development of [an MMB] constitute evidence of changed physical conditions defeating design immunity." (*Sutton, supra,* 68 Cal.App.4th at p. 1162.) The *Sutton* court rejected this argument without determining whether such advances constituted changed physical conditions. The court stated that, "[e]ven if we were to conclude that a technological advancement constitutes a change in physical conditions, here, the record is replete with documentation that there was no change prior to the accident." (*Ibid.*)

Sutton also contended that "changed physical conditions are unnecessary to the loss of design immunity and that immunity ends when it is apparent that the design has created a dangerous condition," based on *Bane*. (*Sutton, supra,* 68 Cal.App.4th at p. 1163.) The *Sutton* court concluded that "*Bane* . . . incorrectly interprets the 1979 amendment" to section 830.6. (*Sutton,* at p. 1164.) The court agreed with *Grenier* that nothing in the amendment's legislative history reflected an intent to expand *Baldwin* " 'and provide for the loss of design immunity in a situation other than changed physical conditions.' " (*Sutton,* at pp. 1163–1164.) The court concluded "that changed physical conditions are necessary to the loss of design immunity," and found no triable issue of fact on design immunity because Sutton had not shown a change in physical conditions. (*Id.* at p. 1164.)

Sutton further claimed that the District nonetheless did not have design immunity under the "changed physical conditions" requirement established in *Baldwin* because the high cross-over accident and fatality rate after completion of the Project was proof that the Project had produced a dangerous condition and that any design immunity had expired. (*Sutton, supra,* 68 Cal.App.4th at

p. 1162.) The *Sutton* court rejected this argument because the record showed a decline in the rates of cross-over accidents following completion of the project. (*Ibid.*)[1]

In *Alvarez v. State of California* (1999) 79 Cal.App.4th 720 [95 Cal.Rptr.2d 719] (*Alvarez*), the Fifth Appellate District—the same district that issued *Bane*—reconsidered the holding in *Bane* that section 830.6 nullified the requirement that a party establish "changed physical conditions," based on *Compton, Grenier,* and *Sutton.* The *Alvarez* court stated that, "[o]n reconsideration of the [1979] amendment [to section 830.6] in light of its legislative history, we conclude that *Bane*'s holding is too broad." (*Alvarez,* at p. 736.) After reviewing some of the analysis and legislative history recited in the other appellate cases, the *Alvarez* court concluded "that design immunity may be lost by evidence that the design *under changed physical conditions* has produced a dangerous condition." (*Id.* at p. 737, italics added.)

■ Finally, in 2001, our Supreme Court summarized the law regarding design immunity in *Cornette* and made clear that "changed physical conditions" are required to defeat a defense of design immunity. The *Cornette* court stated that "[a] public entity is liable for injury proximately caused by a dangerous condition of its property if the dangerous condition created a reasonably foreseeable risk of the kind of injury sustained, and the public entity had actual or constructive notice of the condition a sufficient time before the injury to have taken preventative measures. (Gov. Code, § 835, subd. (b); *Baldwin*[, *supra,*] 6 Cal.3d [at p.] 427 . . . .)

"However, a public entity may avoid such liability by raising the affirmative defense of *design immunity.* (§ 830.6.) A public entity claiming design immunity must establish three elements: (1) a causal relationship between the plan or design and the accident; (2) discretionary approval of the plan or design prior to construction; and (3) substantial evidence supporting the reasonableness of the plan or design. [Citations.]

"Design immunity does not necessarily continue in perpetuity. (*Baldwin, supra,* 6 Cal.3d at p. 434.) To demonstrate loss of design immunity a plaintiff must also establish three elements: (1) the plan or design has become dangerous because of a change in physical conditions; (2) the public entity had actual or constructive notice of the dangerous condition thus created; and (3) the public entity had a reasonable time to obtain the funds and carry out the necessary remedial work to bring the property back into conformity with a reasonable design or plan, or the public entity, unable to remedy the condition due to practical impossibility or lack of funds, had not reasonably

---

[1] Dammann does not challenge the design immunity recognized in *Sutton.*

attempted to provide adequate warnings. (§ 830.6; *Baldwin*, at p. 438.)" (*Cornette, supra*, 26 Cal.4th at p. 66, fn. omitted.)

### 2. *Dammann's "Changed Physical Conditions" Contentions*

As we have discussed, in their opposition to the District's motion for summary judgment, Dammann contended that technological advances regarding MMB's known to the District enabled the installation of a one-foot wide MMB on the Bridge, as demonstrated by the successful use of MMB's on the Coronado Bridge in San Diego and the Auckland Harbor Bridge in New Zealand. Dammann presents several arguments why these technological advances constitute the "changed physical conditions" required by *Baldwin* and *Cornette* to defeat the District's defense of design immunity. None of these arguments are persuasive.

First, Dammann emphasizes that *Sutton* took the assertion "seriously enough to assume *arguendo* that such advances *could* satisfy the requirement, and then evaluated the evidence to see if it supported such a claim. . . . Hence any fair reading of *Sutton* shows that it affords more support to [Dammann] than it does to the District." This argument is of little consequence. As Dammann acknowledges, the *Sutton* court took no position on the legal question involved.

Second, Dammann contends that the court incorrectly ruled that only increased accident rates constitute the requisite changed physical conditions. According to Dammann, none of the cases quoted by the court or the District "hold or support the notion that a showing of increased accidents is the *only* way to satisfy the statutory requirement, nor would such a rule make any sense. In those cases, as was true in *Baldwin*, a claim which the plaintiffs were in fact making *did* involve increased accident rate, but that was all."

We do not need to decide whether only increased accident rates can satisfy the "changed physical conditions" requirement under the circumstances of the present case in order to determine whether or not the technological advances in MMB's relied on by Dammann satisfy this requirement under *Baldwin* and *Cornette*. Dammann's argument misses the larger point. That is, the *Baldwin* court focused its analysis on whether or not there were changed physical conditions at the public property in question, not somewhere in the world. Dammann argues that the *Baldwin* court left "opaque" the meaning of the "changed physical conditions" requirement. We disagree. The *Baldwin* court repeatedly referred to the requirement in language that strongly indicates it intended the term to refer to changes in the physical conditions *at the public property* in question.

Specifically, the *Baldwin* court stated that the case presented the question of whether a public entity retained design immunity "where the plan or design, although approved in advance as being safe, nevertheless *in its actual operation becomes dangerous under changed physical conditions.*" (*Baldwin, supra*, 6 Cal.3d at p. 426, italics added.) The court reconsidered its previous analysis and concluded "that the Legislature did not intend that public entities should be permitted to shut their eyes to *the operation of a plan or design once it has been transferred from blueprint to blacktop.*" (*Id.* at p. 427, italics added.)

Admittedly, the factual issue before the *Baldwin* court involved the claim that an intersection had become hazardous "from changed conditions—e.g., the large increase in traffic" on a boulevard since its construction in 1942. (*Baldwin, supra*, 6 Cal.3d at p. 429.) Nonetheless, the court's framing of the "crucial question" in the body of its analysis again demonstrated that its focus was on the design's operation over time when conditions change *at the public property*: "The crucial question confronting us," the court stated, "is whether the immunity granted by section 830.6 continues to shield a public entity from liability even where, as here, *the actual operation of the plan or design over a period of time and under changed circumstances* discloses that the design has created a dangerous condition of which the entity has notice." (*Id.* at p. 431, italics added.) The court answered the question in the negative. "Having approved the plan or design, the governmental entity may not, ostrich-like, hide its head in the blueprints, *blithely ignoring the actual operation of the plan.* Once the entity has notice that *the plan or design, under changed physical conditions, has produced a dangerous condition of public property*, it must act reasonably to correct or alleviate the hazard." (*Id.* at p. 434, italics added, fn. omitted.)

▌ The phrases we have italicized from *Baldwin* indicate that our Supreme Court was concerned about a design's actual operation when physical conditions *at the public property* involved had changed. To contend otherwise is to distort the plain meaning of that analysis beyond what is reasonable. Given that the Supreme Court has determined that design immunity ends only if a specific set of elements are met, we have no authority to abolish one of them, i.e., the requirement that there be changed physical conditions at the public property in question that produce a dangerous condition. (*Compton, supra*, 12 Cal.App.4th at p. 599, fn. 5 [noting with regard to the ruling in *Bane* that "a lower court cannot 'abolish' Supreme Court rulings," citing *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937]].)

Dammann also argues three grounds why the technological advances they rely on constitute "changed physical conditions," which grounds they characterize as logic, common sense and public policy, and the rationales underlying

the loss of design immunity stated in *Baldwin*. Regarding logic, Dammann argues, "[t]he notion that 'technological advances' can constitute the requisite changed conditions essentially presents the flip side of the increased traffic/accident rate situation. Where implementation of some type of 'technological advance,' such as a median barrier, will eliminate or ameliorate a certain type of injury, the *reduced* number *and severity* of accidents which would otherwise have occurred produces the same sort of significant change, as well as the requisite dangerous condition. Certainly there is no logical way to claim that lives *saved* by the existence of a median barrier are worth any less than lives *lost* due to higher traffic volumes."

Regarding common sense and public policy, Dammann argues that "many inventions and discoveries have helped to shape public policy, including the standards of care which must be met." Dammann insists that "median barriers on highways and bridges fall into the same category, since the failure to install a freeway median can create a dangerous condition . . . ." They conclude that "sound public-policy compels the conclusion that—in any given case—technological advances (and the data produced thereby) *can* constitute the requisite changed physical condition just as readily as a finding of increased traffic volume and accident rates."

Finally, Dammann argues that the *Baldwin* court discussed two rationales that are served by their interpretation. The first was that the public entity "may not ignore 'the actual operation of the plan' once it realizes that a dangerous condition has come to exist." The second was "the *purpose* of design immunity, *viz.*, preventing juries from second-guessing the discretionary determinations of public officials 'by reviewing the identical questions of risk that had previously been considered by the government officers who adopted the plan.' ([*Baldwin, supra,* 6 Cal.3d] at [p.] 434.)" Dammann argues that a new jury decision here would not second-guess the Project because the decision would be based on changed conditions not considered in 1985, i.e., the technological advances in MMB's.

All three of Dammann's arguments are unpersuasive because they ignore the limitation on the "changed physical conditions" exception established by the Supreme Court in *Baldwin*. We conclude that the technological advances Dammann relied on in their opposition to the District's motion for summary judgment do not constitute the "changed physical conditions" necessary to defeat the District's defense of design immunity under *Baldwin* and *Cornette*.

### 3. *The 1979 Amendment to Section 830.6*

Dammann also argues that language in the 1979 amendment to section 830.6 gives "substance and meaning" to *Baldwin*, including by defining "the

opaque and cryptic term 'changed physical conditions" to mean "a design or plan which is 'no longer be [*sic*] in conformity with' a plan which 'reasonably could be approved.' " Dammann contends that, given their interpretation, there is a triable issue of fact regarding what could be "reasonably approved" under the circumstances of this case.

According to Dammann, their reading of section 830.6, as amended in 1979, is supported by "fundamental canons of statutory construction, sound public policy, and all three of *Baldwin*'s rationales," and is not inconsistent with *Baldwin*'s "changed physical conditions" requirement. We will not discuss these particular arguments further because they are not relevant to the principal question before us, which, if resolved against Dammann, makes these arguments irrelevant. That question, already determined by the *Bane*, *Compton*, *Grenier*, *Dole Citrus*, *Sutton*, and *Alvarez* courts, is whether the 1979 amendment was intended to abolish the "changed physical conditions" requirement established by our Supreme Court in *Baldwin*. As we have indicated, only the Fifth Appellate District in *Bane* answered this question in the affirmative. Furthermore, upon its review of the *Compton*, *Grenier*, and *Sutton* decisions, the Fifth Appellate District reconsidered *Bane* in *Alvarez*.

Dammann nonetheless argues that the *Bane* court was correct in concluding that "the amendment should be construed to mean that immunity is lost if the subsequent history shows the design was unreasonable for any reason once the public entity has notice of the dangerous condition and has a sufficient time period to remedy it." (*Bane, supra*, 208 Cal.App.3d at p. 871.) Dammann argues that *Bane* was merely wrong in indicating the 1979 amendment "nullified the *Baldwin* language requiring a change in physical conditions before an approved design may be deemed unreasonable." (*Ibid.*)[2] Instead, Dammann insists that this passage "should be interpreted as entirely consistent with and as implementing *Baldwin*'s 'changed physical conditions' requirement." However, Dammann does not persuasively explain how to do so, and the approach flies in the face of the *Bane* court's own conclusion that *Baldwin*'s "changed physical conditions" requirement had been nullified, as well as the *Alvarez* court's reconsideration of that decision. We conclude that the passages cannot be read together in the manner suggested by Dammann.

As we have discussed, Dammann urges that we adopt an approach that has been rejected by appellate courts in *Compton*, *Grenier*, *Dole Citrus*, and *Sutton*, and disavowed by the Fifth Appellate District in *Alvarez*. In their opening brief, Dammann argues that much of the *Grenier* court's analysis

[2] Dammann makes the second assertion that language in the 1979 amendment provides that a public entity be given sufficient time to both fund and perform the necessary remedial work. In light of our conclusion herein regarding Dammann's first assertion, we need not further discuss this issue.

was "unsound and misleading." In their reply brief, they attempt to distinguish the circumstances of the present case from those found in *Dole Citrus, supra*, 60 Cal.App.4th 486. We agree with the reasoning and conclusions of these cases. We need not review Dammann's arguments in any detail, however, because our Supreme Court has also indicated both the limited scope of the "changed physical conditions" requirement and that this requirement was unaffected by the 1979 amendment to section 830.6.

Specifically, as we have discussed, and contrary to Dammann's assertions, "changed physical conditions" is not an opaque term that was left unexplained by the *Baldwin* court. Rather, the discussion in *Baldwin* indicates the term was intended to refer to changes in the physical conditions of the public property at issue that produce a dangerous condition related to the plan or design at issue. (*Baldwin, supra*, 6 Cal.3d at pp. 426, 427, 431, 434.) This does not include the technological advances relied on by Dammann.

Second, and just as importantly, the *Cornette* court's discussion of the 1979 amendment to section 830.6 indicates that, like the *Grenier* court (as well as the *Compton, Sutton, Dole Citrus*, and *Alvarez* courts), our Supreme Court indicated that the 1979 amendment did *not* abolish the "changed physical conditions" requirement established in *Baldwin*. The *Cornette* court wrote, "In 1979, the Legislature responded to *Baldwin* by amending section 830.6 to specify the circumstances under which a public entity retains its design immunity despite having received notice that the plan or design has become dangerous *because of a change of physical conditions*." (*Cornette, supra*, 26 Cal.4th at p. 71, italics added.) In reviewing the amendment's legislative history, the court stated that its "purpose . . . was best explained" by a letter from its author, Assemblyman John Knox, to the Governor (*id*. at p. 72), and then quoted from the same passage relied upon by the *Grenier* court when it concluded that nothing in the legislative history "reflects an intent to expand *Baldwin* and provide for the loss of design immunity in a situation other than changed physical conditions." (*Grenier, supra*, 57 Cal.App.4th at p. 944; cf. *Cornette*, at pp. 71–72.) The *Cornette* court's discussion indicates it agreed with this conclusion.

In their reply brief, Dammann makes several arguments why we should not consider the *Cornette* court's determination that, regardless of the 1979 amendment, a plan or design must have "become dangerous *because of a change of physical conditions*." (*Cornette, supra*, 26 Cal.4th at p. 71, italics added.) None are persuasive in light of this further discussion of the amendment's legislative history. Dammann further argues that this portion of *Cornette* was dictum because the sole question before the court was "whether

the Legislature intended that the three issues involved in determining whether a public entity has lost its design immunity should also be tried by the court," rather than a jury (*id.* at pp. 66–67), and that the *Cornette* court did not address the question raised by Dammann at any point.

As Dammann points out, "[i]t is . . . to read the language of an opinion in the light of its facts and the issues raised, to determine (a) which statements of law were necessary to the decision and therefore binding precedents, and (b) which were arguments and general observations, unnecessary to the decision, i.e., dicta, with no force as precedents." (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 509, pp. 572–573.) Dammann's analysis ignores that an integral part of the *Cornette* analysis was its determination that one of these "three issues" was that "the plan or design has become dangerous because of a change in physical conditions" (*Cornette, supra,* 26 Cal.4th at p. 72) and, furthermore, that the Legislature did not intend to take this issue away from juries because it did not involve a jury's reweighing of the same information that went into the original plan or design (*id.* at p. 73). Thus, the *Cornette* court's determination of the existence and legislative history of this "changed physical conditions" requirement cannot be said to be dictum, as it was necessary to the court's determination of what was and was not to be tried by the trial court, which was the holding of the case.

Dammann contends that there is no binding precedent which controls the outcome of the issues before us regarding "changed physical conditions." They acknowledge, however, that *Baldwin* and *Cornette* provide "guidance" on the issue. As our discussion indicates, we conclude they provide more than guidance. *Baldwin* can only be reasonably interpreted as requiring that there be changed physical conditions *at the public property in question,* among other things, to end design immunity, and *Cornette* makes clear that this requirement remains intact in the face of the 1979 amendment to section 830.6. We must follow the determinations of the *Baldwin* and *Cornette* courts. (*Auto Equity Sales, Inc. v. Superior Court, supra,* 57 Cal.2d 450.) Therefore, we find unpersuasive Dammann's argument that the 1979 amendment is consistent with and provides content to the term "changed physical conditions" as used in *Baldwin* so as to allow a triable issue of fact regarding what could be "reasonably approved" under the circumstances of this case.

█ In short, we conclude that the technological advances relied on by Dammann do not constitute the required "changed physical conditions" and, therefore, that the trial court did not err in granting the District's motion for summary judgment. In light of our conclusion, we need not address the remaining arguments made by the parties.

## DISPOSITION

The judgment is affirmed. Dammann is ordered to pay the District's costs of appeal.

Haerle, Acting P. J., and Richman, J., concurred.

A petition for a rehearing was denied January 10, 2013, and appellants' petition for review by the Supreme Court was denied March 27, 2013, S208274.