Filed 9/16/15  Van Valin v. Bay Area Rapid Transit Dist.

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SANDRA VAN VALIN, Individually and as Successor in Interest, etc.<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>BAY AREA RAPID TRANSIT DISTRICT,<br><br>　　　Defendant and Respondent. | A140552<br><br>(Alameda County<br>Super. Ct. No. RG12626240) |

On November 2, 2011, William and Sandra Van Valin (the Van Valins collectively, William and Sandra individually) boarded a Bay Area Rapid Transit District (District) train. William was about to sit down when the train started. He lost his balance, fell, and was injured. William sued the District, alleging five negligent acts and a dangerous condition on public property. Sandra joined the suit, alleging a cause of action for loss of consortium. The District moved for summary judgment, and the trial court granted the motion. We reverse because the District failed to meet its burden of production with respect to two of William's five alleged negligence claims.

1

# BACKGROUND[1]

The District is a public entity, organized under California law and operating a rail-based mass transportation system, Bay Area Rapid Transit, commonly known as BART, in the San Francisco Bay Area.

On November 2, 2011, the Van Valins arrived at Oakland International Airport and took a shuttle from the airport to the Coliseum BART station. William was 72 years old and had ridden BART only once, about 12 or 13 years earlier. The Van Valins proceeded through the fare gate to the platform to await a Richmond-bound train, which arrived about 4:30 p.m. William allowed eight to 12 people to board before him, including Sandra. William then boarded the train himself. The Van Valins boarded car 1773, the next to last car in the six-car train.

William was carrying medical equipment in a bag hanging from his left shoulder and a toiletries bag in his right hand. As he boarded the train, he saw an empty seat to his left, about five or six feet away. William proceeded to the seat and put his bags down next to it. He started to lower his body onto the empty seat and was not holding onto anything. At that moment, the BART train began to move. William lost his balance and fell forward onto the floor, sliding and hitting his head on another seat.

The Van Valins filed suit against the District on April 18, 2010. The operative first amended complaint was filed on August 14, 2012. The Van Valins alleged three causes of action: (1) "Respondeat Superior per Government Code Section 815.2"; (2) "Dangerous Condition of Public Property"; and (3) loss of consortium. The first two causes of action were asserted by William and the third by Sandra. William died during the pendency of the Van Valins's suit. The record does not provide reason to believe his death was related to his fall on the BART train. Sandra continued to prosecute William's causes of action as his successor in interest.

---

[1] The facts set forth in the first three paragraphs of this section are taken from the District's separate statement of undisputed facts and supporting exhibits and were not disputed by the Van Valins.

Under the first cause of action, William alleged that a BART train typically makes "sudden and uncontrolled movements," "sudden and violent starts, stops, lurches, etc.," and "sudden and unexpected violent starts, stops and lurches" when departing a station. William also identified five allegedly negligent acts in support of a respondeat superior theory of recovery: (1) the train operator should have delayed shutting the train doors to allow him sufficient time "to safely situate himself in either a seat or standing position" (failure to provide sufficient time); (2) the train operator should have provided "sufficient warning of the imminent departure of the train" (failure to warn of departure); (3) the train operator should have warned about "the risk of sudden and unexpected violent starts, stops and lurches" (failure to warn of lurching); (4) the District's maintenance personnel "failed and neglected to inspect, maintain, repair and/or service" the train he boarded or the track on which it ran (failure to maintain train); and (5) the District's personnel "failed and neglected to operate, inspect, maintain, repair and/or service" the automated train control (ATC) that interacts with the train (failure to maintain the ATC).

Under the second cause of action, William repeated many of the allegations contained under the first cause of action. The essence of his claim for a dangerous condition of public property appears to be contained in paragraphs 42 and 43 of the complaint: William had an "extreme vulnerability to the sudden and uncontrolled movements of a BART train while exiting a station" and "the BART train . . . created an unreasonable and substantial risk of harm . . . . This risk was not readily apparent, indeed, concealed from plaintiff, and substantially compounded by the absence of any warning of both the imminent departure of the train, and its tendency to violently lurch, stop and start when exiting a station, a danger well-known to BART personnel, but unknown to persons unfamiliar with the BART system. Indeed, the absence of such warnings constitutes a dangerous condition in and of itself." These allegations present three possible "dangerous conditions": (1) the tendency of the train to violently lurch, stop and start; (2) the absence of a warning that the train has such a tendency; and (3) the absence of a warning of imminent train departure.

3

The third cause of action, for loss of consortium, is derivative of the first two causes of action, alleging that as a result of the District's negligence and the dangerous condition of public property, Sandra was deprived of William's affection, assistance, society and moral support.

In its answer to the complaint, the District asserted numerous affirmative defenses, including design immunity pursuant to Government Code section 830.6.[2]

On June 21, 2013, the District filed a motion for summary judgment or, in the alternative, for summary adjudication. The District sought summary judgment or adjudication based on five issues: (1) "To the extent Plaintiff's first, second and third causes of action are based on the alleged negligence of the train operator, they fail as a matter of law because the undisputed evidence shows that the train operator cannot influence the manner of the train's acceleration"; (2) "Plaintiffs cannot sustain their second cause of action, for dangerous condition of public property, because the acceleration of the [BART] train does not constitute a dangerous condition, as a matter of law pursuant to Government Code §§ 830(a) and 830.2"; (3) "Plaintiffs cannot sustain their second cause of action, for dangerous condition of public property, because there is no evidence that a [District] employee negligently or wrongfully created an allegedly dangerous condition"; (4) "[The District] is entitled to the affirmative defense of design immunity, Government Code § 830.6, thus barring Plaintiffs' claims based on the condition of [the District's] property"; and (5) "Plaintiff Sandra Van Valin's cause of action for loss of consortium has no merit as a matter of law because it is derivative of Plaintiff William Van Valin's causes of action."

The District's motion was accompanied by a separate statement of undisputed material facts (separate statement), declarations and several exhibits. In addition to facts about William's movements up to the time he fell on the train, the facts the District identified as material for purposes of summary judgment concern BART train

---

[2] Further statutory citations are to the Government Code, unless indicated otherwise.

acceleration, the maintenance of the train on which the accident occurred, and incidents related to the starting of a train reported by BART patrons. Concerning acceleration, the District's separate statement provides that: (1) the train did not make any jerking or lurching motions as it departed the station after the Van Valins boarded; (2) each car in a BART train possesses its own source of tractive effort, so that the train is driven by all cars simultaneously and neither pushed nor pulled; (3) each car receives the identical tractive effort command from equipment in the operator's cab and responds in identical fashion; (4) the operator has no means of influencing the train's rate of acceleration; (5) design specifications call for train cars to accelerate at three miles per hour per second, with an acceptable deviation of plus or minus 10 percent; (6) all cars have a jerk-limiting feature, limiting the rate of acceleration change by controlling the mechanical torque produced by the traction motors of the cars; (7) the jerk-limiting design specification is two miles per hour per second per second, with an acceptable deviation of plus or minus 10 percent, so that when starting from a stop, it takes 1.5 seconds for the train to reach the full acceleration rate of 3 miles an hour per second; and (8) the acceleration standards and jerk-limiting standards are industry standards and were part of the original design of the BART system, approved by the District's Board of Directors.

Concerning train maintenance, the District's separate statement and evidence indicates that: (1) there were no reports of patrons falling on the car the Van Valins boarded on November 2, 2011, other than William, and there was no report of any malfunction related to performance of the car; (2) the maintenance history of the car for 30 days before and after November 2, 2011, does not indicate any propulsion failure that might have caused the car or train to exceed its specified acceleration limit.

Finally, concerning incidents related to the starting of a train, the District states that: (1) from November 2, 2009, through November 2, 2011, BART had a total system ridership of 207,075,676 patrons (counting exits from a BART station through a fare gate); (2) in the same period, 41 BART patrons reported an on-train incident involving the starting of the train's motion, including William.

5

The District's motion—both its memorandum and separate statement—addressed the Van Valins's negligence theories related to train acceleration and lurching. It did not address the Van Valins's claim that the train operator failed to provide sufficient time for Willian to safely board in either its memorandum or its separate statement. Nor did it address their claim that the operator failed to warn them of the train's imminent departure.

The Van Valins's opposition to the District's motion for summary judgment/adjudication asserted that their negligence claims had "nothing to do with acceleration" and addressed only their theories of negligent failure to provide sufficient time and negligent failure to warn of departure. With one exception, the Van Valins did not dispute the District's listed material facts. The District had asserted that "[u]pon Mr. Van Valin entering the train, the doors closed." The Van Valins noted that in William's deposition, he had merely said that he didn't recall how much time passed between his entering the train and the doors closing. By failing to dispute other facts in the District's separate statement, the Van Valins conceded, contrary to the allegations of their complaint, that the train did not jerk or lurch when it departed the station.

The Van Valins's separate statement and accompanying evidence asserted additional facts, including that: (1) the 41 on-train incidents involving the starting of the train's motion show that a person 50 years of age or older is injured, on average, once every 4.07 weeks on a BART train, and 87 percent of the incident-reporting patrons were age 60 or older; (2) a train remains at a station for a minimum amount of time (the "scheduled dwell time"), after which the operator receives a signal; (3) the train operator controls the shutting of the doors; (4) if the doors are shut after expiration of the scheduled dwell time, the train will immediately depart; (5) the time a train actually remains at a station is called the "actual dwell time"; (6) prior to closing the doors, the operator is required to look down the entire length of the train to determine whether any patrons are entering or exiting, and if no one is entering or exiting, the operator closes the doors; (7) the scheduled dwell time for the train the Van Valins boarded was 15 seconds, no different from that at almost all stations on the Fremont-Richmond line, but the actual

6

dwell time on November 2, 2011, was 23 seconds; (8) an automated announcement indicating that the doors are closing occurs at the expiration of the scheduled dwell time; and (9) William neither heard or saw any warning that door closure or departure was imminent. The opposition included the declaration of Kenneth Nemire, a human factors consultant who evaluates "the specific circumstances of personal injury incidents as they relate to human capabilities and limitations" and "how well environments have been designed or maintained to meet the requirements of people who use them." Nemire attested to several of the above facts and opined that an elderly passenger may require up to 16.1 seconds to search for a seat, walk to a seat, set down a package, turn around and sit down. Based on his examination of on-board incidents over an approximately two-year period, he further opined that "BART is not allowing enough time for elderly patrons to find a seat and sit down before moving the train from the station" and that this failure, coupled with the absence of a warning of the train's imminent departure before closing doors, "presented a fall hazard to elderly passengers."

The District filed a reply to the Van Valins's opposition on October 4, 2013, which neither party included in the record. The District has neither argued nor stated in its respondent's brief that it disputed any of the additional facts set forth in the Van Valins's opposition or objected to any of their evidence in the trial court.

On October 11, 2013, the court issued an order for supplemental briefing "addressing whether Nemire's declaration creates a triable issue of material fact as to the train operator's duty to wait 16 (or any other number of) seconds before closing the train door after Plaintiffs boarded, or alternatively, whether the Court can decide that issue of duty as a matter of law." The District and the Van Valins filed supplemental briefs.

After issuing a tentative ruling to which the parties submitted, the court granted the District's motion for summary judgment. It did not rule separately on the District's summary adjudication motion. The court first held that the Van Valins's claims based on "any purported defect with the train" or "the train's rate of acceleration" failed because the undisputed evidence established that there were no defects with the train, and any claim based on the rate of acceleration was barred by section 830.6. The court then held,

7

as a matter of law, that the District had no duty to wait any particular amount of time after the Van Valins boarded before closing the train doors, because William's injury was unforeseeable and the burden of imposing such a duty on the District would be excessive. Finally, the court held that the Van Valins's claim for a dangerous condition on public property failed "because Plaintiffs no longer contend that there was any physical defect affecting the train on which the accident occurred." The trial court's order did not address the Van Valins's allegation that the train operator had negligently failed to warn of train departure. The court dismissed the suit and entered judgment in favor of the District.

The Van Valins timely filed a notice of appeal.

## DISCUSSION

We review a grant of summary judgment de novo. (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 253.) "We view the evidence in the light most favorable to plaintiffs as the parties opposing summary judgment, strictly scrutinizing defendant['s] evidence in order to resolve any evidentiary doubts or ambiguities in plaintiffs' favor." (*Dammann v. Golden Gate Bridge, Highway & Transportation Dist.* (2012) 212 Cal.App.4th 335, 340–341.)

"First, and generally, from commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. That is because of the general principle that a party who seeks a court's action in his favor bears the burden of persuasion thereon. (See Evid. Code, § 500.) There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. . . . A defendant [moving for summary judgment] bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto. [Citation.]

"Second, and generally, the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable

8

issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . . A prima facie showing is one that is sufficient to support the position of the party in question." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850–851, fns. omitted; see Code Civ. Proc., § 437c, subd. (p).)

A defendant moving for summary judgment bears a "heavy" burden of persuasion. (*Jennifer C. v. Los Angeles Unified School Dist.* (2008) 168 Cal.App.4th 1320, 1332–1333.) The defendant must negate each of "plaintiff's theories of liability *as alleged in the complaint.*" (*Hutton v. Fidelity National Title Co.* (2013) 213 Cal.App.4th 486, 493.) To negate a theory of liability or cause of action, the defendant must do one of two things: (1) demonstrate that "[o]ne or more of the elements of the cause of action cannot be separately established" or (2) establish "an affirmative defense to that cause of action." (Code Civ. Proc., § 437c, subd. (o).) To show that an element of a cause of action or theory of liability cannot be established, the defendant may present facts which, if undisputed, "conclusively negate" the element (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 853) or may show "that the plaintiff does not possess, and cannot reasonably obtain, needed evidence—as through admissions by the plaintiff following extensive discovery to the effect that he has discovered nothing." (*Id.* at p. 855.)

In analyzing a motion for summary judgment, both the trial court and the reviewing court follow a three-step process: " 'First, we identify the issues raised by the pleadings, since it is these allegations to which the motion must respond; secondly, we determine whether the moving party's showing has established facts which negate the opponent's claims and justify a judgment in movant's favor; when a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue.' " (*Waschek v. Department of Motor Vehicles* (1997) 59 Cal.App.4th 640, 644.)

Every motion for summary judgment must be supported by a "separate statement setting forth plainly and concisely all material facts which the moving party contends are

undisputed." (Code Civ. Proc., § 437c, subd. (b)(1).) Generally, if a fact is not set forth in the separate statement, we will not consider it. (*City of Pasadena v. Superior Court* (2014) 228 Cal.App.4th 1228, 1238, fn. 4.)

## I.

### *The Causes of Action at Issue on Appeal*

Although the Van Valins's complaint contains a single "cause of action" for negligence under a respondeat superior theory of liability, there are five separate theories of negligence. To prevail on its motion for summary judgment, the District was required, in the absence of an affirmative defense, to show—for *each* of the Van Valins's five negligence theories—that at least one essential element of a negligence cause of action could not be established. (*Conn v. National Can Corp.* (1981) 124 Cal.App.3d 630, 639 [requiring that a defendant moving for summary judgment "affirmatively react" to each theory made in the complaint that supports liability]; *Teselle v. McLoughlin* (2009) 173 Cal.App.4th 156, 173 [failure to address a material allegation of complaint was a "fatal flaw" in defendant's motion for summary judgment]; cf. *Lilienthal & Fowler v. Superior Court* (1993) 12 Cal.App.4th 1848, 1854–1855 [summary adjudication may be sought concerning "a distinct wrongful act even though combined with other wrongful acts alleged in the same cause of action" in the complaint].)

The Van Valins abandoned several of their allegations of negligence after the District presented evidence that there was no indication in maintenance records or incident reports that the train had not started its motion smoothly or accelerated in a way that deviated from its design. Although the complaint stressed a tendency of BART trains to violently lurch, start or stop, William had admitted in deposition testimony proffered by the District with its motion that the train did not jerk or lurch. In their opposition memorandum, the Van Valins disavowed their negligence theories relating to acceleration, stating "[t]he allegations of negligence against the BART train operator and other personnel have nothing to do with acceleration." They asserted that their negligence claims were limited to two of their alleged omissions: failure to provide sufficient time for William to safely situate himself prior to departure and failure to

10

provide a warning of imminent departure.  Having thus failed to dispute any of the facts presented by the District regarding their third, fourth and fifth negligence theories (see pp. 2–3, *supra*),[3] the Van Valins do not and could not challenge the trial court's ruling as to those claims. This leaves their first and second negligence claims, alleging insufficient time to safely board and failure to warn of imminent departure.  (See *ibid*.)

Regarding the failure to provide sufficient time theory, the Van Valins argued that the operator should have observed Van Valin's age and infirmities and left more time after he boarded before closing the doors (and thereby starting the train), and that BART schedulers should have increased "the scheduled dwell time at stations likely to be serving persons in need of extra time to board" and "buil[t] in additional time between door closure and departure when the doors are closed after expiration of the scheduled dwell time at any station."  Regarding the failure to warn theory, they argued that it encompassed failure to provide either "automated or manual" warnings of imminent departure when doors were kept open beyond the train's dwell time.  The Van Valins's arguments on appeal are also limited, as regards the negligence cause of action, to the failure to provide sufficient time and failure to warn of departure theories, which are the only ones we need examine.

On appeal, the Van Valins also do not dispute that so far as their claim for a dangerous condition on public property relates to the train's acceleration, the District is entitled to design immunity under section 830.6.[4]  Thus, the Van Valins cannot press a

---

[3] Each of these theories was predicated on acceleration-related acts or omissions, including failure to warn of lurching and failure to safely maintain or operate the train, the track or the automated control system.  (See pp. 2–3, *supra*.)

[4] The District suggests on appeal that section 830.6 design immunity could work to defeat a claim of negligence.  That District did not make this argument in the court below—Issue 4 for summary adjudication, was:  "[The District] is entitled to the affirmative defense of design immunity, . . . thus barring Plaintiffs' *claims based on the condition of [the District's] property . . . .*"  (Italics added.)  Generally, "[s]ection 830.6 provides a public entity with an affirmative defense of design immunity in actions arising out of an alleged dangerous condition of public property."  (*Sutton v. Golden Gate Bridge, Highway & Transportation Dist.* (1998) 68 Cal.App.4th 1149, 1157.)  We need

11

claim that acceleration, in conformance with District design, from a stopped position at a station presents a dangerous condition. Nor, do the Van Valins argue on appeal that their dangerous condition claim is based on a failure to warn of lurching or jerking. This leaves the alleged absence of a warning that the train was about to depart as the sole basis for their cause of action for a dangerous condition on public property.

Finally, Sandra's cause of action for loss of consortium presents no separate issues in this appeal. It is dependent on the survival of at least one of William's causes of action, so we do not address it separately.

## II.

### *The District Did Not Satisfy Its Burden of Production on William's Two Remaining Theories of Negligence.*

At issue in this appeal are William's allegations that the train operator negligently failed to provide sufficient time and to warn of departure. We examine each of these allegations and conclude that the District failed to satisfy its burden of production for both, providing independent grounds for reversal of the order granting the District's motion for summary judgment.

**A.      As a Matter of Law, the District Owes Passengers a Duty of Care for Their Safe Carriage.**

It is established by statute that common carriers "must use the utmost care and diligence for their [passengers'] safe carriage, must provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill." (Civ. Code, § 2100.) This duty "applies to public carriers as well as private carriers and requires them to do all that human care, vigilance, and foresight reasonably can do under the circumstances." (*Lopez v. Southern Cal. Rapid Transit Dist*. (1985) 40 Cal.3d 780, 785.) The duty is not boundless, however. "Common carriers are not . . . insurers of their passengers' safety. Rather, the degree of care and diligence which they must exercise is only such as can

---

not decide whether design immunity can ever be a defense to a negligence cause of action not involving a dangerous condition because the District waived the issue by failing to raise it in the trial court.

12

reasonably be exercised consistent with the character and mode of conveyance adopted and the practical operation of the business of the carrier." (*Ibid.*)

As the District points out, "[t]he question is, what does that mean in the context of this action?" As already mentioned, the Van Valins's complaint puts flesh on the bones of the District's broad, general common carrier duty by alleging that the train operator should have observed William as he boarded the train, noticed his age and infirmities and delayed shutting the doors for an unstated amount of time "sufficient . . . to allow him to safely situate himself in either a seat or standing position." The question is whether the acts the Van Valins allege defendants should have taken fall within the scope of their duty of utmost care.

As our Supreme Court has explained: "In determining a duty's existence and scope, our precedents call for consideration of several factors: ' "[T]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." ' (*Ann M. [v. Pacific Plaza Shopping Center* (1993)] 6 Cal.4th [666,] 675, fn. 5, [overruled on other grounds by *Reid v. Google Inc.* (2010) 50 Cal.4th 512, 527,] quoting *Rowland v. Christian* (1968) 69 Cal.2d 108, 113, (*Rowland* ).) Foreseeability and the extent of the burden to the defendant are ordinarily the crucial considerations, but in a given case one or more of the other Rowland factors may be determinative of the duty analysis." (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1213 (*Castaneda*).) In *Castaneda*, the court adopted a four-step analytical process for determining the scope of a duty. First, the court must "identify the specific action or actions the plaintiff claims the defendant" should have taken to prevent the harm. Second, it must " 'analyze how financially and socially burdensome these proposed measures would be to [the defendant], which measures could range from minimally burdensome to significantly burdensome under the facts of the case.' " Third,

13

it must identify the harm " 'that the plaintiff claims could have been prevented had the [defendant] taken the proposed measures, and assess how foreseeable (on a continuum from a mere possibility to a reasonable probability) it was that this [harm] would occur.' " Fourth and finally, the court compares the foreseeability and the burden in determining the scope of the duty. (*Id.* at p. 1214.) " 'The more certain the likelihood of harm, the higher the burden a court will impose on a [defendant] to prevent it; the less foreseeable the harm, the lower the burden a court will place on a [defendant].' . . . [O]ther *Rowland* factors may come into play in a given case, but the balance of burdens and foreseeability is generally primary to the analysis. " (*Ibid.*)

The Court adopted this analytical framework in deciding the scope of property owners' duties to tenants and other invitees, but it is useful in other negligence contexts as well. The *Rowland* factors have been used in negligence cases generally. (See, e.g., *John B. v. Superior Court* (2006) 38 Cal.4th 1177, 1189.) In particular, the *Rowland* factors have been used to determine the scope of a common carrier's duty.[5] (See, e.g., *McGettigan v. Bay Area Rapid Transit Dist.* (1997) 57 Cal.App.4th 1011, 1022–1023.) In accord with *Casteneda*, " '[f]oreseeability and extent of burden to the defendant . . . have evolved to become the primary [*Rowland*] factors' to be considered on the question of legal duty." (*Campbell v. Ford Motor Co.* (2012) 206 Cal.App.4th 15, 33, italics removed; see *Castaneda*, *supra*, 41 Cal.4th at p. 1213.) In considering the scope of the District's duty, however, we are mindful that the degree of care owed by common carriers is higher than for most other actors; it is a duty of "utmost care and diligence" in regard to passengers' safety.

Finally, the *Castaneda* court recognized that "[a]lthough duty is a legal question," the court decides it against a "factual background" which in turn "is a function of a particular case's procedural posture." (*Castaneda*, *supra*, 41 Cal.4th at p. 1214.) In the summary judgment context, the court's ability to decide the issue will turn on whether

---

[5] Both the District and the Van Valins relied upon the *Rowland* factors in their supplemental briefs concerning duty in the court below.

14

material facts related to the *Rowland* factors are in dispute. (See, e.g., *Barnes v. Black* (1999) 71 Cal.App.4th 1473, 1478–1479, 1480 [reversing grant of summary judgment where defendant failed to offer evidence to negate *Rowland* factors bearing on scope of duty]; *Lawrence v. La Jolla Beach & Tennis Club, Inc.* (2014) 231 Cal.App.4th 11, 28–33 [reversing grant summary judgment where defendants failed to meet their burden to show scope of their duty of care did not extend to taking measures plaintiffs claimed should have been taken]; *Barber v. Chang* (2007) 151 Cal.App.4th 1456, 1468–1470 [reversing summary judgment where moving defendant did not address whether measures it failed to take were so burdensome as to fall outside the scope of his duty, observing "whether the [defendant's] conduct is 'reasonable under the circumstances—that is, whether there was a breach of the defendant's duty of care,' [is] generally [a question] of fact for a jury"]; *Silva v. Union Pacific Railroad Co.* (2000) 85 Cal.App.4th 1024, 1029 [" 'Although the determination of duty is primarily a question of law, its existence may frequently rest upon the foreseeability of the risk of harm. [Citations.] Foreseeability may be decided as a question of law only if, under the undisputed facts, there is no room for a reasonable difference of opinion' "].)

**B.     The District Failed to Meet Its Burden to Negate the Scope or Breach of the Duties Plaintiffs Alleged.**

**1.     *Failure to Provide Sufficient Time***

The Van Valins alleged that "the duty to exercise the utmost care and the vigilance toward its passengers required the train operator to have, among other actions, observed [William] as he boarded the train with sufficient attention to have noticed his extreme vulnerability as described above [(i.e., his advanced age and consequent infirmities relative to balance, mobility and upper body strength, manifested by his physical appearance and slowed gait)] and delayed the shutting of the train doors a sufficient amount of time after plaintiff entered to allow him to safely situate himself in either a seat or standing position such that he would be able to withstand the sudden and unexpected violent starts, stops and lurches of the BART train that typically occur as they depart the station." The Van Valins's theory is that the train operator's duty of care includes the

15

duty to observe all passengers boarding trains, to determine whether any are old, infirm or otherwise in need of extra time, and to delay closing the train doors (and thus the start of the train) for a sufficient period of time after boarding to ensure they can safely situate themselves. They allege William was obviously old and infirm and the operator did not provide sufficient time after he boarded to ensure he could safely situate himself.

The District's notice of motion of summary judgment failed even to mention, much less address, this theory. Regarding the Van Valins's negligence claims, it asserted only that those claims "fail[ed] as a matter of law because the undisputed evidence shows that the train operator cannot influence the train's acceleration." The District's memorandum contained a single paragraph addressing the negligence claims, which, consistent with the notice of motion, argued only that "[t]o the extent Plaintiffs' claims are based on the train's operation, [the District] is entitled to summary adjudication because the undisputed evidence shows that the operator cannot influence the manner of the train's acceleration," including the rate of acceleration or the "pre-defined jerk-limiting function." Nowhere in its memorandum did the District address whether its duty as a common carrier to exercise the utmost care toward its passengers includes within its scope the duty to observe passengers boarding, determine how long they might need to safely situate themselves, and delay the start of the train for the necessary period. Having failed even to address the issue, much less provide relevant argument or authorities, the District failed to meet its burden of negating the elements of this negligence theory of liability.

To have done so, the District was required to provide arguments and evidence demonstrating that its duty of utmost care did not encompass the acts the Van Valins alleged its operator should have but did not take: observing the condition of passengers, making a judgment about the amount of time needed for safe boarding, and holding doors open long enough for the last passenger to safely situate himself. As already discussed, relevant to the scope of duty are the *Rowland* factors—foreseeability of harm to the plaintiff, degree of certainty that plaintiff suffered injury, closeness of the connection between defendant's conduct and the injury, moral blame attached to defendant's

16

conduct, policy of preventing future harm, and extent of the burden to defendant and consequences to the community of imposing a duty of the scope advocated by plaintiff. The District's memorandum did not even cite *Rowland*, much less discuss the factors it identifies. Nor did it otherwise address the acts the Van Valins claimed the operator should have undertaken or why a scope of duty that included those acts should not be imposed.

Other than the basic facts regarding William's boarding of the train and his fall, the District's separate statement cited some evidence relating to the *Rowland* factors, in particular to foreseeability, that might bear on the scope of its duty. Specifically, it cited statistics concerning the number and frequency of accidents BART has recorded relating to the starting of trains' motion (41 such accidents over a two-year period) and the number of passengers BART has served over that time (207 million passenger rides). Interestingly, the District's supporting declaration attached a document indicating that of the 41 such accidents during that two-year period, most involved elderly passengers. The District did not discuss this information, much less address its relevance to the plaintiffs' insufficient time and failure to warn theories, in its memorandum in support of summary judgment. It thus failed to meet its burden as the moving party either to negate an element of the Van Valins's claims or to demonstrate that they cannot reasonably obtain evidence needed to establish those claims.

The District did discuss the relevance of this information to the Van Valins's first and second negligence theories, for the first time, in its supplemental briefing on the duty of care issues, arguing that because only one reported patron incident related to the starting of a train occurred per (about) five million rides on the system, William's injury was unforeseeable. Even if we were to consider the District's belated argument regarding the paucity of incidents and the Van Valins's duty to warn and duty to provide sufficient time claims, we could not find that the District met its burden. At most, the District's evidence demonstrates that such accidents are few in number compared to the overall number of passengers served. Even though the rate of train start incidents is very low, 41 patrons reported such accidents in the two years leading to William's accident. We

17

cannot say as a matter of law that an accident such as William's was unforeseeable. (See *Lawrence v. La Jolla Beach & Tennis Club, Inc.*, *supra*, 231 Cal.App.4th at p. 31 [" ' "[t]he mere fact that a particular kind of accident has not happened before does not . . . show that such accident is one which might not reasonably have been anticipated" ' "].)

The District also argued in its supplemental brief—but did not offer any evidence—about the burdens that a duty imposing the longer wait time the Van Valins claimed was needed would impose on it and the public. It went so far as to argue—citing no evidence—that "the burden would be enormous," indeed "crippling," whether accomplished through staffing or technology, and that a wait of 16 seconds (as suggested in the Nemire declaration) "would nearly double the station dwell times, resulting in a significant loss of transit service to Bay Area residents and visitors." Courts cannot grant summary judgment based on facts a party pulls out of nowhere, like the magician's rabbit from a hat. Because none of these factual assertions was referenced in the District's separate statement, much less supported by any evidence, the trial court should not have, and we will not, consider them. [6]

As to breach of the posited duty, the time that William had to do the things he did before the train started is undoubtedly relevant. The District argued in its supplemental brief it was "undisputed" that William had "boarded the train safely" and that the District provided "numerous options for patrons such as Mr. Van Valin to secure themselves once they board the train, including grab bars and handles adjacent to the door and along the entire length of the car." However, that William was able to proceed to an empty seat and start to sit does not, of itself, make a prima facie case that he had sufficient time to situate himself safely. It might have sufficed if the District had actually asserted in its

---

[6] In its order granting the District's order for summary judgment, the trial court wrote: "[T]he burden on [the District] of imposing the duty [the Van Valins] allege (in having to determine whether every passenger was safely situated before closing the door and starting the train) would be enormous, as would the burden on the public—and the efficiency and utility of the entire BART system—if the train operators could not start the trains moving until 16 seconds after the last passenger boarded."

18

memorandum and separate statement that ample grab bars and handles were available on the train and that William had ready access but chose not to use one. Not only did the District fail to refer to these facts in its memorandum and separate statement, it also failed to offer any other evidence that might have shifted the burden on the question of duty— for example, safety studies, industry standards or declarations from experts concerning the time it would take for an older patron, after entering BART or a similar train, to situate himself safely.

In short, the District failed in its moving papers to present facts sufficient to entitle it to judgment as a matter of law on the theory that the train operator negligently failed to provide sufficient time for William to safely situate himself. Accordingly, we reverse the trial court's order granting the District's motion for summary judgment. We emphasize that we are not holding that the operator or the District had a duty to take all or any of the steps the Van Valins allege they should have taken. Rather, we hold only that absent facts and arguments relating to the *Rowland* factors in the moving defendant's motion for summary judgment, it was error for the trial court to decide the duty question as a matter of law. The trial court's request and the parties' filing of supplemental briefs could not cure the District's failure to provide facts supported by sufficient evidence.

### 2. *Failure to Warn of Departure*

William alleged that "the duty to exercise the utmost care and . . . vigilance towards its passengers required the train operator to have, among other actions, provided sufficient warning of the imminent departure of the train . . . ."

Again the District did not address the issue of warnings in its memorandum. In particular, the District failed to argue or provide authority that it did not have a duty to warn William of the imminent departure of the train. Nor do any of the facts in its separate statement bear on whether a warning of imminent departure was or was not provided. For example, the District made no showing that it would be especially burdensome to require train operators to provide an oral warning at the time or shortly before they manually close train doors that the train is about to depart. The District failed to meet its burden of production on this theory of negligence liability as well, nor did the

19

trial court address this theory in its order granting summary judgment.  This provides a second, independent ground for reversal of the order.

### III.

### *The Train Operator's Failure to Warn of Departure Does Not Support a Cause of Action for a Dangerous Condition on Public Property.*

Section 835 provides:  "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:  [¶] (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or  [¶]  (b) the public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

"Liability under Government Code section 835 for maintaining public property in a dangerous condition depends . . . upon the existence of *some* defect in the property itself and the existence of a causal connection between that defect and the plaintiff's injury." (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1138.)  We agree with our Division Four colleagues, who have written:  " '[A] claim alleging a dangerous condition may not rely on generalized allegations [citation] but must specify in what manner the condition constituted a dangerous condition.' [Citation.]  A plaintiff's allegations, and ultimately the evidence, must establish a *physical* deficiency in the property itself.  [Citation.]  A dangerous condition exists when public property 'is physically damaged, deteriorated, or defective in such a way as to foreseeably endanger those using the property itself,' or possesses physical characteristics in its design, location, features or relationship to its surroundings that endanger users." (*Cerna v. City of Oakland* (2008) 161 Cal.App.4th 1340, 1347–1348 [relying on *Zelig*, among other cases].)

20

As we discussed above, whether failure to warn of train departure supports a cause of action for a dangerous condition on public property is the sole issue on appeal related to this cause of action. We have already determined that the Van Valins's claim that the train operator negligently failed to warn of the imminent departure of the train survives the District's motion for summary judgment/adjudication. However, the alleged failure of a train operator to provide a warning on a particular occasion does not amount to a physical damage, deterioration, or defect in District property or involve "physical characteristics in [the property's] design, location, features or relationship to its surroundings that endanger users." (*Cerna v. City of Oakland*, *supra*, 161 Cal.App.4th at pp. 1347–1348.) Nor did the Van Valins allege in their complaint that the lack of a warning was a matter of design. Instead, under their first cause of action, and incorporated by reference into the second cause of action (for dangerous condition on public property), the Van Valins alleged that "the train operator had the sole power to perform the ministerial act of shutting the train doors *and providing warnings to the passengers*." (Italics added.) Accordingly, because the Van Valins claimed no physical defect in the train, and no design defect involving a physical characteristic of the BART system, their cause of action for dangerous condition of public property fails as a matter of law.

## DISPOSITION

The judgment is reversed and the matter is remanded for further proceedings in conformance with this opinion. Because the trial court did not rule on the District's alternative motion for summary adjudication, it is free to do so on remand, in conformance with this opinion. The Van Valins shall recover their costs on appeal.

21

_____
STEWART, J.

We concur.


_____
KLINE, P.J.


_____
MILLER, J.

*Van Valin v. Bay Area Rapid Transit District* (A140552)